# NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

# SPRING ARBOR DISTRIBUTION COMPANY, Respondent.

### No. 94–5260.

United States Court of Appeals, Sixth Circuit.

Argued April 13, 1995.

Decided July 17, 1995.

Joan Hoyte-Hayes, Office of Gen. Counsel, Aileen A. Armstrong, Deputy Ass'n Gen. Counsel (briefed), Paul J. Spielberg, Vincent J. Falvo, Jr. (argued), N.L.R.B., Washington, DC, for petitioner.

David B. Gunsberg, Gunsberg & Breskin, Bloomfield Hills, MI (argued and briefed), for respondent.

Before: MARTIN, RYAN, and GIBSON,* Circuit Judges.

RYAN, Circuit Judge.

■ The National Labor Relations Board petitions this court to enforce the Board's order against the Spring Arbor Distribution Company. The Board found that Spring Arbor had committed an unfair labor practice, in violation of sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, when Spring Arbor refused to bargain with the UAW, whom the Board had certified as the collective bargaining representative of warehouse workers in Spring Arbor's Belleville, Michigan, facility. Spring Arbor's response raises one dispositive issue: Whether the NLRB erred when it refused to dismiss the Union's petition supporting the rerun election of May 28, 1992.

We conclude that it did, and therefore we decline to enforce the Board's order.

## I.

Spring Arbor is a distributor of religious books and publications. Since the company's founding, its national distribution warehouse had been at Belleville, Michigan. The company also has regional distribution centers in other states.

On April 9, 1991, the UAW petitioned the NLRB to represent the workers at the Belleville warehouse. An election was ordered: On April 30, 1991, the Union and Spring Arbor reached a stipulated agreement regarding the appropriate unit and the procedures for conducting the election. On June 7, 1991, the election was held. The results were 76 votes against the Union, 71 votes for the Union, and 21 challenged ballots. The Union filed objections to the election, complaining of Spring Arbor's pre-election misconduct.

On September 10, 1991, a hearing officer dismissed seven of the Union's eight objections, but sustained the eighth objection. He recommended setting the election aside. The sustained objection related to comments by Spring Arbor's management relating to the employer's "open door policy" and inviting worker complaints. Spring Arbor filed objections to the hearing officer's recommendation with the NLRB.

In January 1992, while the Board was reviewing Spring Arbor's objections to the hearing officer's recommendation, Spring Arbor announced in its monthly newsletter that it would be converting its Belleville warehouse into a regional distribution warehouse and buying a new facility in Tennessee to act as its new national distribution warehouse. The newsletter discussed problems with the Belleville facility relating to its inadequate size, and estimated that 40 jobs would remain at the Belleville warehouse after the main operation was transferred to Tennessee.

At about the same time, Spring Arbor circulated booklets entitled "Facing the Challenges of the Future," in which the company discussed the conversion and the resulting layoffs. The booklet begins by stating:

> The Michigan warehouse will change from a central warehouse facility to a regional warehouse. We expect this change to take place during or around May, 1992. We will require 40 employees working full time in the Michigan warehouse. In late May, all part-time employees' status will change to an on-call basis.
>
> . . . .
>
> We will provide everyone employed full time in good standing as of January 3, 1992 at Spring Arbor, the opportunity to perform a job somewhere in the company at a wage appropriate to the new position. Although relocated jobs may not be acceptable to some of you, an ongoing employment opportunity is available with Spring Arbor.

On April 2, 1992, the company mailed layoff notices to 122 employees. The notices were intended to comply with the requirements of the Worker Adjustment and Retraining Notification Act (WARN Act), 29 U.S.C. §§ 2101–2109. Each worker was sent one of two different letters, which we will

---

* The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

refer to as Letter A and Letter B. Letter A indicated that the employee would be laid off in the two-week period between June 5 and June 19, 1992. Letter B indicated that the employee would be laid off in the two-week period between June 12 and June 26, 1992. All layoffs were expected to take place in the three-week period between June 5 and June 26, 1992. By using a two-week period of time for each employee, Spring Arbor sought to satisfy the federal regulations that grew out of the WARN Act, which state that the "date" of an employee's expected layoff can be a specific date or a two-week period. 20 C.F.R. § 639.7(b).

On April 8, 1992, the Board, in a 2-1 decision, upheld the hearing officer's recommendation that the June 7, 1991, election be set aside and ordered a new election. The acting regional director scheduled the new election for May 28, 1992. On April 30, 1992, Spring Arbor supplied the acting regional director with the list of employees eligible to vote at the election: the list contained only the names of the employees who were not targeted for layoff.

On May 1, 1992, Spring Arbor filed a motion with the acting regional director asking that the Union's petition supporting the rerun election be dismissed on the grounds that the unit was no longer appropriate in that the vast majority of the employees were imminently to be laid off. In the alternative, Spring Arbor asked for a hearing to demonstrate that the employees' layoffs were imminent. On May 7, the acting regional director denied the motion without a hearing. Spring Arbor sought review of this decision with the Board, but the Board denied review.

On May 28, 1992, the second election was conducted. The initial tally of the votes was 25 against the Union, 8 for the Union, and 90 challenged ballots. Four of the challenged ballots are of no interest to this petition for enforcement. The other 86 challenged ballots were challenged by the Board agent conducting the election on the ground that those ballots were cast by employees whose names did not appear on the list of eligible voters supplied by Spring Arbor. Spring Arbor objected to the challenged ballots, again claiming that the employees to be laid off should not be counted as members of the bargaining unit.

Spring Arbor asserts on appeal that all of the 122 employees were laid off as planned. The NLRB does not deny that the layoffs occurred as planned, but argues that whether the layoffs occurred or not is irrelevant under the law. We assume the employees were indeed laid off.

On July 1, 1992, the acting regional director recommended that Spring Arbor's objections be overruled and the 86 challenged ballots be counted. On September 25, well after the layoffs, the Board affirmed that recommendation and ordered the ballots to be counted. Among the 86 ballots from the laid off employees, the votes were 22 against the Union and 64 for the Union, which made a new total of 72 for the Union and 47 against. On October 14, the Board certified the Union as the collective bargaining representative for the employees.

On October 28, the Union sent a letter to Spring Arbor requesting information such as employee names and addresses. Spring Arbor did not respond. The Union complained to the Board agents and on February 11, 1993, the General Counsel issued an unfair labor practice complaint against Spring Arbor, accusing it of refusing to bargain with the certified bargaining representative. On June 2, 1993, a hearing took place before an ALJ, who found that Spring Arbor had committed an unfair labor practice and ordered it to bargain with the Union. On September 30, 1993, the Board summarily adopted the recommendation and order of the ALJ. On March 1, 1994, the Board filed a petition with this court seeking enforcement of its order.

## II.

### A.

 Spring Arbor contends that the Board erred when it decided not to cancel the rerun election when it was advised of the imminent layoff of a substantial number, indeed a majority, of the Belleville warehouse employees. We have no doubt that the matter is within the Board's considerable discretion, but that discretion is not limitless. We

have held that "[t]he Board's determinations regarding whether and when an election should be held are reviewed for abuse of discretion." *NLRB v. Engineers Constructors, Inc.,* 756 F.2d 464, 467 (6th Cir.1985). The discretionary judgment involved here is broader than merely whether to order an election at a particular time; it is really concerned with the proper definition of the bargaining unit.

■ "Because of its experience and expertise, and in light of the need to shape a bargaining unit to the facts of a particular case, the Board is given broad authority to determine a unit appropriate for the purposes of collective bargaining." *NLRB v. Catherine McAuley Health Ctr.,* 885 F.2d 341, 344 (6th Cir.1989) (quoting 29 U.S.C. § 159(a)) (internal quotation omitted).

However, the Board's discretion in unit determinations is not without constraints, and if the Board's bargaining unit determination "oversteps the law," it must be reversed.... In addition to explicit statutory limitations, a bargaining unit determination by the Board must effectuate the Act's policy of efficient collective bargaining. In this regard, the scope of judicial review of a unit determination is limited to ensuring that the Board's exercise of its authority is not so arbitrary or capricious, or so unsupported by evidence, as to amount to an abuse of discretion.

*Id.* (citations omitted).

■ When this court reviews the Board's findings of fact,

[w]e may not disturb those factual findings by the Board or its administrative law judge that are supported by substantial evidence. Evidence is substantial when, on the record as a whole, the evidence is adequate, in a reasonable mind, to uphold the Board's decision. However, substantial evidence is more than a mere scintilla of evidence. Therefore, our review must include consideration of any record evidence that runs contrary to the Board's findings.

*DTR Indus., Inc. v. NLRB,* 39 F.3d 106, 110 (6th Cir.1994) (citations, internal quotations, and alterations omitted).

With these limitations on our authority in mind, we turn to the law governing elections in an expanding or contracting unit.

"Normally, under the Board's existing rules to warrant an immediate election where there is definite evidence of an expanding or contracting unit, the present work complement must be substantial and representative of the ultimate complement as projected both as to the number of employees and the number and kind of job classifications."

*Engineers Constructors,* 756 F.2d at 466 (quoting *Douglas Motors Corp.,* 128 N.L.R.B. 307, 308 (1960)). "A decision regarding the timing of an election involves balancing the often conflicting policies of maximum employee participation in the selection of a bargaining agent and permitting employees as immediate representation as possible." *Id.* at 467 (citing *ClementBlythe Companies,* 182 N.L.R.B. 502 (1970)).

The Board has consistently held that when a job is scheduled for completion within four months no useful purpose is served by determining representation. It is likewise clear that mere reduction of the number of employees in a unit is not alone sufficient to justify postponing an election.... [I]n the election area, a case-by-case approach is followed.

*Id.,* at 467–68 (citations omitted).

■ The analysis is twofold, then. First, the Board must determine whether there is definite evidence of an expanding or contracting unit. Only if this threshold question is answered in the affirmative does the Board go on to engage in the balancing necessary to determine the appropriate unit and time for the election.

**B.**

■ Here, the director determined, at least implicitly, that he was not faced with a "contracting unit" because he found that the layoffs were "speculative." Our first concern, therefore, is whether this determination is supported by substantial evidence. The parties discuss at some length the proper balancing analysis that the Board applies when there is a petition for an election in an

expanding or contracting unit. What both parties overlook, however, is that the Board never exercised its "broad discretion." After the acting regional director concluded that the layoffs were speculative, he conducted none of the balancing required for an expanding or contracting unit situation. Given the finding that the layoffs were "speculative," the decision to conduct no balancing was proper in that the balancing is required only when there is "definite evidence" that the unit is expanding or contracting. The Board denied review of the director's decision, so it too conducted no balancing.

After the rerun election, the acting regional director again addressed Spring Arbor's complaint about the appropriateness of the election and the appropriateness of the unit when he reviewed the objections to the 86 challenged ballots cast by the employees who had been notified of their impending layoffs. The director stated, in a report dated July 1, 1992: "Inasmuch as the Region and Board *previously determined* that conducting the election on May 28, 1992, in the unit set forth above was appropriate, it is my conclusion that the Employer's objections [to the 86 ballots] should be overruled in their entirety. . . ." (Emphasis added.) The report acknowledges that Spring Arbor had advised the director that it had laid off the employees by June 26. Upon reviewing the director's decision, the whole of the Board's analysis of this issue was: "The Board has reviewed the record in light of the exceptions and brief, and adopts the Acting Regional Director's findings and recommendations." The ALJ who heard the refusal to bargain charge also relied on the prior "decision" as conclusive and not reviewable. The Board adopted the ALJ's findings without further analysis. Six times the issue of the appropriateness of the unit or the election was before the Board and its agents. The contracting unit analysis was never conducted, and indeed, the issue was only substantively addressed once: all subsequent reviewers relied on the acting regional director's initial finding that the layoffs were speculative as conclusive and precluding further review.

Before this court, the Board argues that it was not unreasonable for the Acting Regional Director to conclude that the date of conversion for the Belleville facility was less than definite as of early May and that, in any event, the current workforce was "substantial and representative" when compared with the workforce projected following the change. It follows that the Director acted within his broad discretion when he declined to dismiss the Union's petition and cancel the election.

The Board's reasoning is flawed in two respects: First, the standard of review for a fact-finding, that is, that the conversion date was "less than definite," is not whether the finding was "reasonable," but rather whether the finding was based on substantial evidence. Second, if the director had decided that the work force was "substantial and representative," that decision might have been reasonable. However, the director never made such a determination because he never conducted the required balancing analysis. The director's entire "analysis" after the conclusion that the layoffs were speculative was:

It is noted that the [NLRB] cases cited by the Employer are factually distinguishable from the situation herein and further involve an initial petition rather than a second election ordered by the Board as a result of the Employer's misconduct.

Nowhere did the director find that the unit was "substantial and representative." Similarly, the Board never conducted the analysis necessary to determine the appropriateness of an election in a contracting unit situation, and therefore never determined that the unit was "substantial and representative."

There is no dispute that Spring Arbor did refuse to bargain with the UAW or that the Board had certified the UAW as the bargaining agent of the warehouse employees. Therefore, the Board's finding that Spring Arbor had committed an unfair labor practice is correct if the Board had not erred in certifying the UAW. The correctness of the certification depends wholly on the correctness of the director's finding that the impending layoffs were speculative. We conclude that the director's finding was not based on substantial evidence and so we

therefore conclude that the Board erred in certifying the UAW as the bargaining agent.

The acting regional director found that the impending layoffs were speculative primarily because the notices sent to the employees, Letters A and B, stated, "We do not know at this point in time exactly when you will be laid off." The whole of the director's reasoning in denying Spring Arbor's motion to dismiss the petition is:

In support of its Motion the Employer argues that it is in the process of converting its facility from a central warehouse to a regional warehouse, a conversion which will entail the layoff of a substantial number of employees whose job classifications will be changing. Although active employees have apparently been given notice of impending layoffs under the Worker Adjustment and Retraining Notification Act, such notices state "we do not know at this point in time exactly when you will be laid off" but provide anticipated date ranges in June 1992 for such layoffs.

Under the circumstances herein, the undersigned concludes that the Employer has not presented a sufficient basis for dismissing the petition or conducting a hearing on the issues raised at this time. It is noted that the [NLRB] cases cited by the Employer are factually distinguishable from the situation herein and further involve an initial petition rather than a second election ordered by the Board as a result of the Employer's conduct.

An examination of the full text of the notice letters reveals that the single sentence the director quoted from the layoff notice letters was taken out of context. The middle paragraph of Letter A, which explains when and why the employee will be laid off, states:

Accordingly, this notice is to advise you of your impending layoff. We do not know at this point in time [April 2, 1992] exactly when you will be laid off. However, we anticipate that layoffs will begin the week ending June 5, 1992, and continue through the week ending June 26, 1992. It is anticipated that your layoff will take effect some time between June 5 and June 19, 1992. Regardless of employment opportunities which may be available to you in other Spring Arbor departments or warehouses, it is expected that your layoff will be permanent with respect to your position at the Michigan warehouse. As was explained to you in our brochure concerning this change, the remaining positions [at the Michigan warehouse] were filled through selection of qualified employees using seniority as the primary selection criteria. You did not qualify for one of the remaining positions in the Michigan warehouse, and no bumping rights exist for you with respect to any other position at any Spring Arbor facilities.

Letter B had the same language except that the expected layoff dates were between June 12 and June 26.

In its May 1, 1992, motion to dismiss the petition for election, Spring Arbor stated:

If the Petition is not dismissed on the basis of this Motion, the Employer asserts that the facts surrounding this situation should be presented at a Hearing. The Employer is willing to demonstrate that the schedule for termination of current Belleville operations and employees, originally established in January and April of this year[,] has not changed, but instead has been finalized. Although the Employer contends that the facts in this case are clear and demonstrate a definite and substantially contracting unit, the Employer would be willing to prove its position, at a Hearing....

The director concluded that Spring Arbor had "not presented a sufficient basis" for conducting a hearing.

In our judgment, the record is devoid of any evidence that would support the conclusion that the layoffs were speculative. The only evidence arguably supporting such a finding is the single sentence from the layoff notice which states, in effect, that the layoffs will occur, not on a date certain, but sometime within a two-week period. On the other hand, the record contains the following substantial evidence that the layoffs were not speculative and, in fact, were imminent.

First, the January 1992 edition of Spring Arbor's monthly newsletter, *The Spring Arbor Grapevine*, began with a three-page let-

ter from Glenn Bailey, Spring Arbor's president. In this letter, Bailey informed the employees that the Michigan warehouse was no longer sufficient to serve as the national warehouse for Spring Arbor. Bailey stated that a new facility in Newport, Tennessee, was being purchased to serve as the new national distribution warehouse. Bailey stated that the Tennessee facility would cost half of what a similar facility would cost anywhere else. Bailey stated that he expected to have only 40 fulltime employees remain at the Michigan warehouse, and that the Tennessee facility would be fully operational in early June of that year.

Bailey's letter made four promises to employees who would be laid off:

—If an employee wanted to seek a job with another company, Spring Arbor would provide job placement resources.

—Anyone who remained an employee until the time of the layoffs but who did not accept a position in another Spring Arbor facility would be given severance pay.

—Any employee who did not want to accept a job at the Newport, Tennessee, facility, could apply for a job at any other Spring Arbor facility, which were in Michigan, California, Texas, Oregon, Florida, and Arkansas.

—All employees willing to move to Tennessee would be given jobs at the Newport facility and would be given a moving allowance.

Second, at the same time that the *Grapevine* made this announcement, Spring Arbor circulated a booklet entitled "Facing the Challenges of the Future." This booklet has the following sections:

—An introduction that states the change to a regional warehouse will take place "during or around May, 1992."

—A section titled "What Opportunities Will There Be in the Michigan Warehouse?" which lays out how many of various job titles will be needed after the changeover. This section also describes

how Spring Arbor will decide who fills the available positions.

—A section titled "What Employment Opportunities Will There Be in Other Spring Arbor Departments?" which discusses the possibility of getting a job in Michigan doing nonwarehouse work, or in other parts of the country at the other regional warehouses. The section states that any job openings will be posted on a bulletin board.

—A section titled "What is Newport, Tennessee Like and Why Was It Selected?" which describes the town of Newport, Tennessee. This section states that wages in that area are lower but claims that workers who transfer will find that the cost of living is so much less that the lower wages actually amount to an increase in income. This section also describes the moving allowance that Spring Arbor will provide for each employee, which is based on years of service.

—A section titled "What If I Decide To Leave Spring Arbor?" which discusses placement services available through Spring Arbor's Human Resources Department (H.R.D.). This section also details the severance pay for departing employees, which would be (TOTAL HOURS WORKED AT SPRING ARBOR) × (LAST HOURLY WAGE) × 4%.

—A section titled "H.R.D. Services Available" which details some other services available from the H.R.D.

Lastly, as we have said, on April 2, 1992, all employees to be let go were sent letters identifying the two-week period during which they would be laid off.

Against this factual background, the acting regional director's conclusion that the layoffs were speculative is astounding. Consequently, we conclude that the director's finding that the layoffs were speculative is not supported by substantial evidence and the Board, therefore, erred by declining to engage in the balancing analysis appropriate to a petition for election in a contracting unit.[1]

---

1. Because we decline to enforce the Board's order for the reasons discussed, we need not ad-

dress Spring Arbor's argument that the Board's order violates the principles of the National La-

## III.

The Board's petition is **DENIED**.

bor Relations Act by forcing the 33 remaining employees to be represented by a union that was not the choice of the majority.