*299 ALICE M. BATCHELDER, Circuit Judge.
Guardian Armored Assets, LLC, and Guardian Armored Security, operating as Guardian Security Services (“Guardian”), petition for review of a decision of the National Labor Relations Board (“NLRB” or “Board”), holding that Guardian had violated §§ 8(a)(1) and 8(a)(5) (29 U.S.C. §§ 158(a)(1) & (5)) of the National Labor Relations Act (“the Act”) by refusing to bargain with Intervenor International Union, Security, Police and Fire Professionals of America (“the Union”). See 29 U.S.C. § 160(f). The Board’s decision followed the decision of the director of the Region 7 office of the NLRB (“the regional office”) certifying the Union as the exclusive bargaining representative of certain employees of two of Guardian’s three Michigan facilities. The NLRB petitions for enforcement of its order requiring Guardian to cease and desist from refusing to bargain with the Union and from interfering with employees in the exercise of their rights, and that Guardian post a remedial notice. See 29 U.S.C. § 160(e). Because we find that the NLRB did not abuse its discretion and the underlying decision of the regional office was supported by substantial evidence, we will grant the NLRB’s petition for enforcement and deny Guardian’s petition for review.
I. Factual Background
A. Guardian Corporate Structure and Activities
Guardian provides a wide range of security services to its clients, including alarms, security guards, medical monitoring, and armored car transportation of valuables. It employs approximately 1700 people and has its corporate offices in Southfield, Michigan. The case involves the Guardian armored car division, which employs approximately 370 people, including about 50 managers and other non-guard personnel. Non-supervisory guard personnel include 10 types of guards, specialists, vault associates, security officers, dispatchers, and tellers.
The business of the armored car division is conducted out of three branch offices; the Highland Park office, which has approximately 250 employees; and the Mt. Morris and Comstock Park offices, which have approximately 60 employees each. The three branch offices are strategically located to serve Guardian’s customers in Michigan and northwest Ohio, though none of them has a geographically defined territory. Highland Park and Mount Morris are approximately 75 miles apart; Highland Park and Comstock Park are approximately 190 miles apart; and Comstock Park and Mt. Morris are approximately 100 miles apart. Guardian determines which branch to work from in providing service to a customer based on that customer’s needs and security considerations.
Jeffrey Prough (“Prough”), the President of Guardian Security Services, and Jeff Kipp (“Kipp”), the Vice President, oversee all of Guardian’s operations — including the labor relations policies — of all divisions, including the armored car division. Both officers are in regular contact with all divisions and branches. Hugh Adams (“Adams”) is the general manager of Guardian’s armored car division, and has an office at each branch location. He rotates around to the branches and oversees employee scheduling, customer accounts, and weekly management training meetings. The branches are controlled by the same human resources and business departments as the company at large, and the centralized functions include purchasing; billing; promulgation of employment policies, handbooks, and the like; payroll; hiring, firing, layoffs, transfers, and promotions; and orientation training.
*300 At the Highland Park branch, Guardian’s general manager is in charge of the armored car division as well as other divisions housed in the same facility, and an assistant branch manager and a customer service manager are in charge of most of the armored car division’s day-to-day operations. Two assistant branch managers oversee daily operations at the Mt. Morris facility, and a branch manager oversees daily operations at Comstock Park. The managers in charge of the three facilities communicate with each other regularly on the phone.
Each day there is a shuttle run among Highland Park and the other two branches in which one armored car picks up and delivers currency and paperwork; generally the same employees work this route every day. Additional runs between facilities are less frequent. Employees transfer among branches on occasion to cover a particular facility’s operations when it is temporarily short-handed, although Guardian does not keep track of how often this occurs or how many employees are involved when it does occur. Guardian presented testimony that there had been a few instances of temporary transfers in the two years preceding this case, one of which involved 6 or 7 guards over the course of three days, and that there have been roughly 11 permanent transfers among the three facilities over that same two-year period. Adams decides which employees will be going to the other branches when temporary transfers are needed, although the transfers are usually on a voluntary basis.
B. Representation Proceedings
Prior to 2004, none of the three branches had any history of collective bargaining. On March 12, 2004, the Union submitted a request to the regional office that a single bargaining unit be recognized covering 180 employees, to include all of Guardian’s “full time and/or regular part time security officers and drivers performing guard duties” at all three branch locations. The regional office directed that a hearing be held on the petition, but the Union withdrew the petition shortly before the appointed hearing date. The Union then filed a second request, proposing a single bargaining unit consisting of full-time and part-time employees performing guard duties at the Mt. Morris and Highland Park facilities, and stating that the number of employees involved would be 200.
The regional office conducted a hearing on the second request. At that hearing, the Union again changed its position and asked that the Highland Park and Mount Morris facilities each be a separate bargaining unit and that each have its separate election. Guardian opposed the certification of one bargaining unit for each branch on the grounds that Guardian’s business operations at all three Michigan branches are fully integrated, branches have no autonomy from one another or from the company at large, and employees assigned to each branch regularly coordinate, interchange, and interact with employees from the other branches. It therefore contended the appropriate bargaining unit would be a single unit consisting of all full-time and part-time guards at all three of its facilities.
The director of the regional office granted the Union’s request and ordered separate elections at the Highland Park and Mt. Morris facilities, finding that the separate bargaining units requested by the Union are appropriate for collective bargaining purposes within the meaning of § 9(b) of the Act (29 U.S.C. § 159(b)). The director acknowledged the evidence in the record showing that Guardian has centralized control over personnel decisions and some centralized control over daily opera *301 tions; the employees at all locations have the same skills; and all employees are paid at the same rate. The director nonetheless noted that a single-facility bargaining unit is “presumptively appropriate” unless other considerations show that the units have been effectively merged or have otherwise lost their separate identities.
The director based his decision that separate units are appropriate on findings that the branches retain some autonomy over day-to-day operations, there is minimal interchange and interaction between employees at the various branches, and the geographical distance between the facilities is substantial. Especially significant to the director was the fact that the degree of employee interchange among the Guardian branches is much less frequent than that found in In re Purolator Courier Corp., 265 NLRB 659, 1982 WL 24052 (1982), and In re Dayton Transport, 270 NLRB 1114, 1984 WL 36511 (1984), two previous decisions in which the NLRB found that the presumption of a single-location unit had been rebutted because of the high degree of interrelatedness.
Finally, the director concluded that vault leaders and dispatchers would be included within the collective-bargaining unit, and allowed the lone assistant supervisor to vote in the election under challenge. Mechanics were excluded from the bargaining unit.
Guardian filed a request for review with the NLRB, which was denied by two members of a three-member panel. The two elections were held on June 10, 2004, and the Union was certified as the exclusive bargaining representative of each unit. The Union requested that Guardian begin bargaining, but Guardian refused to recognize the Union as the employees’ bargaining agent on the grounds that the determination that there be two units was legally improper.
The Union filed an unfair labor practices charge with the NLRB, alleging violations of §§ 8(a)(1) and (5) of the Act (29 U.S.C. § 158(a)(1) & (5)). Based on the charge and a subsequent investigation, the general counsel of the regional office issued a complaint against Guardian. The regional office filed a motion for summary judgment, and the NLRB issued a show cause order, to which Guardian responded. The NLRB granted summary judgment to the regional office, finding that Guardian’s refusal to bargain with the Union violated §§ 8(a)(1) and (5) of the Act. It rested its decision on reasoning contained in the determination by the regional office that two bargaining units were appropriate, and noted that Guardian had not presented any newly discovered evidence or alleged any special circumstances to justify its refusal to bargain. Guardian now petitions for review of this decision, and the NLRB seeks to enforce its order.
II. Petition for Review
A. Standard of Review
The Supreme Court has held that the NLRB’s determination that a particular collective bargaining unit is appropriate “lies largely within the discretion of the Board,” and that an exercise of the NLRB’s discretion “is rarely to be disturbed.” South Prairie Constr. Co. v. Operating Eng’rs, Local 627, 425 U.S. 800, 805, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) (citing 29 U.S.C. § 159(b)). See also Office Depot, Inc. v. NLRB, 184 F.3d 506, 507-508 (6th Cir.1999). In accord with this broad grant of discretion, we review the NLRB’s decision only to ensure that it is not arbitrary, unreasonable, or an abuse of discretion. Armco, Inc. v. NLRB, 832 F.2d 357, 362 (6th Cir.1987); NLRB v. Child World, Inc., 817 F.2d 1251, 1253 (6th Cir.1987). See also NLRB v. American *302 Seaway Foods, Inc., 702 F.2d 630, 632 (6th Cir.1983) (stating that the scope of review is “exceedingly narrow”)- We must accept the NLRB’s factual findings unless those findings are not supported by substantial evidence, considering the record as a whole. 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Dayton Newspapers v. NLRB, 402 F.3d 651, 659 (6th Cir.2005) (“Substantial evidence consists of such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.”) (internal quotations and citations omitted); NLRB v. Spring Arbor Distrib. Co., 59 F.3d 600, 604 (6th Cir.1995) (“[S]ubstantial evidence is more than a mere scintilla of evidence. Therefore, our review must include consideration of any record evidence that runs contrary to the Board’s findings.”).
B. “Appropriate” Units Under the Act
Section 9(b) of the Act gives the NLRB the power to determine the scope of the unit appropriate for the purposes of collective bargaining, so as to “assure to employees the fullest freedom in exercising the rights guaranteed by the Act____” 29 U.S.C. § 159(b). The determination of an appropriate bargaining unit depends heavily on the facts of each individual case. See Bry-Fem Care Center, Inc. v. NLRB, 21 F.3d 706, 709 (6th Cir.1994). The NLRB does not have to select the most appropriate unit, but is charged only with selecting an appropriate unit for bargaining from a range of units of appropriate size. See Am. Hosp. Ass’n v. NLRB, 499 U.S. 606, 610, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991); Office Depot, 184 F.3d at 508; NLRB v. First Union Mgt., 777 F.2d 330, 333 (1985).
Generally, the NLRB has broad discretion in determining whether a petitioned-for bargaining unit is appropriate and in ordering representation elections. See Bry-Fern, 21 F.3d at 709; NLRB v. A.J. Tower Co., 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946); Tony Scott Trucking, Inc., v. NLRB, 821 F.2d 312 (6th Cir.1987). We have recognized that the NLRB utilizes a presumption that a single location in a multiple-location business is an appropriate bargaining unit. See Child World, 817 F.2d at 1253; Wyandotte Sav. Bank v. NLRB, 682 F.2d 119, 120 (6th Cir.1982). See also 29 U.S.C. § 159(b) (a “plant unit” may be appropriate). But see NLRB v. Catherine McAuley Health Ctr., 885 F.2d 341, 347 (6th Cir.1989) (presumption unwarranted where actual separation of facilities cannot be shown). Therefore, the burden at the agency level is on the employer to overcome this presumption and to show that such a unit is inappropriate, not simply that a more appropriate unit exists. See Dunbar Armored, Inc. v. NLRB, 186 F.3d 844, 847 (7th Cir.1999); In re J & L Plate, Inc., 310 NLRB 429, 429,1993 WL 37605 (1993).
An “appropriate” unit is one which furthers the Act’s policy of efficient collective bargaining. See 29 U.S.C. § 159(b). When making a determination as to whether to approve a bargaining unit, “the extent to which the employees have organized shall not be controlling,” 29 U.S.C. § 159(c)(5), so the fact that the employees self-identify in single-location units is not the only factor to be considered. See Catherine McAuley, 885 F.2d at 344. Moreover, the agency must explain the basis for its order and give a “clear indication that it has exercised the discretion with which Congress has empowered it.” NLRB v. Metro. Life Ins. Co., 380 U.S. 438, 443, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965).
On past occasions, the NLRB has both declined to certify single-branch bargaining units in the armored car business, see *303 In re American Courier Corp., 184 NLRB 602, 1970 WL 25655 (1970); Purolator Courier, 265 NLRB 659; and approved single-location bargaining units in the armored car business, see Dunbar Armored, 186 F.3d at 848; NLRB v. J.W. Mays, Inc., 675 F.2d 442, 443 (2d Cir.1982); In re New Britain Transp. Co., 330 NLRB 397, 397,1999 WL 1286025 (1999); In re Courier Dispatch Group, Inc., 311 NLRB 728, 728, 1993 WL 188282 (1993). Finally, it is undisputed that the NLRB is to consider several factors when determining whether the presumption of single-location units has been rebutted: (1) centralized control versus local autonomy over daily operations and labor relations; (2) similarity of skills, functions, and working conditions; (3) degree of employee interchange; (4) geographic proximity of the various branch offices; and (5) bargaining history. Office Depot, 184 F.3d at 508.
C. Analysis
Guardian argues that the NLRB’s decision rested completely on the presumption that a single-location unit is appropriate and that the decision was inconsistent with prior precedent, failed to comport with the requirements of the Act, and was not supported by substantial evidence.
1. Inconsistency With Prior Precedent
Initially, Guardian argues that the NLRB’s decision in this case must be overturned because it failed to explain why it was departing from its own precedent in cases in which it did not permit single-location bargaining units. However, the NLRB is not required to discuss every instance in which it has encountered similar facts and to detail how it distinguishes those cases from the one presently before it, lest it be found to have abused its discretion. Furthermore, as we shall explain, this decision did not depart from prior precedent.
2. Failure to Conform to Requirements of the Act
Guardian points to the fact that the Union, after filing its initial petition, twice changed its position regarding the appropriate bargaining units. It argues that these changes were made in an effort to obtain NLRB approval of bargaining units in which the Union would have the greatest chance of winning representation elections. The fact that the NLRB upheld the separate bargaining units and separate elections demanded by the Union demonstrates, according to Guardian, that, contrary to § 9(c)(5) of the Act, the NLRB relied exclusively, or at least too heavily, on the extent to which the employees had organized themselves prior to the approval of the petition. See 29 U.S.C. § 159(c)(5) (“In determining whether a unit is appropriate for the purposes specified in subsection (b) of this section the extent to which the employees have organized shall not be controlling.”). Employee organization is one of the factors that may be taken into account in determining the appropriate bargaining units, although it is not dispositive of the issue. See id.; see also Metro. Life Ins. Co., 380 U.S. at 442, 85 S.Ct. 1061. But the record contains no evidence that the NLRB actually took employee organization into account here, and the fact that the Union repeatedly changed its position as to the bargaining units it wanted certified does not, without more, demonstrate that the NLRB gave undue weight to that factor.
Guardian argues further that the Board’s decision did not comport with the requirement that the decision “effectuate the Act’s policy of efficient collective bargaining.” See Catherine McAuley, 885 F.2d at 344. However, Guardian points to *304 no particulars and provides no explanation to support this claim. This objection is without merit.
3. Substantial Evidence
While asserting that “[n]ot even a ‘scintilla’ of evidence supports the Board’s critical findings here,” Guardian discusses only the volume of evidence that supports its own contention that a multiple-location bargaining unit would be appropriate. Guardian sheds little light on the issue before us here: whether the record as a whole lacks substantial evidence supporting the NLRB’s position. We agree that Guardian has presented strong evidence to support its position. But even if we — had we been the finders of fact here — might have come to the conclusion Guardian urges, unless Guardian demonstrates a lack of evidence supporting the NLRB’s position, we cannot overturn the NLRB findings. And we conclude that this record contains substantial evidence supporting the NLRB’s decision.
a. Local Autonomy/Functional Integration
Guardian argues that “all matters that might ultimately become the subject of collective bargaining are determined by Guardian centrally.” However, there is evidence on the record that employees report to their respective branch offices every day, get their assignments from that branch, are dispatched from that branch, maintain contact with that branch while on their routes, and return to that branch at the end of the day. There are assistant branch managers that make sure that the employees working from that branch are performing their job duties within company guidelines, ensure that the work is completed, and contribute to the employees’ performance evaluations. And though customers are not assigned to any particular facility, the service to a given customer on a given day is dispatched from one of the three branches, not from any central facility.
It is true that, where labor policy is determined centrally, and where local managers do not have the authority to decide collective bargaining matters, the facts weigh against location-specific bargaining units. See NLRB v. Pinkerton’s, Inc., 428 F.2d 479, 484 (6th Cir.1970); Wayne Oakland Bank v. NLRB, 462 F.2d 666, 667-68 (6th Cir.1972). Guardian relies heavily on the fact that here, only the central human resources department performs functions relating to hiring, firing, and transferring employees. But in Dunbar Armored, the Seventh Circuit found sufficient evidence supporting the single-location bargaining units under very similar circumstances. 186 F.3d at 849; see also Michigan Hosp. Serv. Corp. v. NLRB, 472 F.2d 293, 294-95 (6th Cir.1972); In re Esco Corp., 298 NLRB 837, 840, 1990 WL 122469 (1990) (centralized operations and labor relations, limited local autonomy, common skills and functions of employees not enough to overcome presumption where lack of employee interchange and geographic separation between branches); In re AVI Foodsystems, 328 NLRB 426, 1999 WL 318901 (1999); Armco, 832 F.2d at 364 (admitting that centralized hiring goes in favor of certifying a multi-location bargaining unit, but finding that other factors overcame this factor and did not necessarily imply that the NLRB’s decision was unreasonable). Guardian does not dispute that a single-location unit could be appropriate where there is “some” local autonomy, and there is enough evidence here to support the director’s finding that “some” autonomy exists.
b. Employment Policies and Work Conditions
Guardian cites to the undisputed facts that employment policies are formulated *305 centrally; all hiring, firing, transfers, and promotions are done centrally; personnel records are kept in the central office; and all employees, regardless of home office, are subject to the same rules and conditions and are paid on the same scale and given the same benefits and time off. Again, the same was true in Dunbar Armored, where the court nonetheless found substantial evidence to support the NLRB’s conclusions. See 186 F.3d at 846, 848. See also Armco, 832 F.2d at 364 (admitting that uniform wages, hours, and terms of employment are facts in favor of certifying a multi-location bargaining unit, but finding that other factors overcame this factor and did not necessarily imply that the NLRB’s decision was unreasonable); American Seaway, 702 F.2d at 633 (similarity of skills, working conditions, pay and fringe benefits not enough to overcome other factors). Guardian has not provided evidence that the NLRB’s findings in this regard were incorrect.
c. Supervision
The regional director found that local supervisors direct the day-to-day operations at the branches. Guardian contends this finding is unsupported, citing the various centralized features of the business. While the record certainly establishes that there is central management, the record shows that there is also permanent direct management at each of the branch locations, and the direct management implements the centrally formulated policy and ensures that the employees are performing their assigned tasks. In re Waste Management, 331 NLRB 309, 311, 2000 WL 791212 (2000), is inapposite: in that case, the NLRB did find that there was direct management and that single-location bargaining units were inappropriate, but relied heavily on the finding that the direct management of employees at a branch location was done by a manager at the main office who would drive out to the branch location every day to hand out work assignments. Similarly, in In re Frito-Lay, Inc., 202 NLRB 1011, 1012, 1973 WL 12252 (1973), the salesmen seeking to unionize worked out of their homes and the only common supervision was a regional sales manager.
Prough testified that the on-site managers do contribute to employee evaluations, though they do not perform all of the functions related to evaluating employee performance. He further testified that the on-site supervisors report directly to Adams and are the primary people responsible for ensuring employee compliance with company policy and that the employees perform their assigned tasks. In short, when Adams and Prough need to find out what is going on at one of the branches when they are not present, they contact the management at that branch, which has direct oversight there. This is enough evidence to support the finding of the presence of local supervision.
d. Interaction and Interchange
In approving the requested single-location units, the regional director also found that the degree of employee interaction and interchange among the branches was minimal. In rebuttal, Guardian cites the two regular' routes between each of the branches, occasional instances where an armored car will begin the day at one branch and end up at another, interaction with employees from the other branches at two “consolidation centers” operated by bank customers, and weekly dispatch of personnel from one branch by dispatchers at different branches. The record also contains some evidence of permanent and temporary transfers from one branch to another, and of the company-wide posting of job openings. Guardian claims that the employees from the branches also interact *306 with one another at orientation and at company-wide awards ceremonies and social events.
Purolator Courier and American Courier, in which the NLRB found that the degree of employee interchange and interaction overcame the presumption of a single-location bargaining unit, are distinguishable. In Purolator Courier, the NLRB found that about 50 percent of the workforce interacted on a daily basis with guards from other branches because the deliveries were completed relay-style; 25 percent stayed overnight at another branch location; and 15 percent performed routes only between branch locations. 265 NLRB at 661-62. In American Courier, the couriers often met each other at different locations and passed off materials in relay fashion. 184 NLRB at 603. Nothing even remotely approaching these levels is present here.
The NLRB has in the past also refused to find the presumption in favor of single-location bargaining units overcome where the degree of interchange and interaction was greater than it is in this case. See Dunbar Armored, 186 F.3d at 849; Courier Dispatch, 311 NLRB at 728, 730. And though there is also evidence that 11 employees were permanently voluntarily transferred — out of roughly 350 guards— during the two years preceding this case, the NLRB has previously found 21 transfers among 172-182 employees over 3-4 years insubstantial. See J & L Plate, 310 NLRB at 430. The NLRB’s finding that the degree of employee interaction and interchange was “minimal” is supported by the record.
e. Geography
In arriving at its decision the NLRB noted that the distances between the facilities is significant but not controlling. In previous decisions, the NLRB has refused to approve single-location units where the employer had more facilities over greater distances that are present here, see American Courier, 184 NLRB at 603; Purolator Courier, 265 NLRB at 661; Szabo Food Services, Inc. v. NLRB, 550 F.2d 705, 708 (2d Cir.1976); Frito-Lay, 202 NLRB at 1011; Waste Mgt., 331 NLRB at 311, and has approved such units in circumstances where a similar or shorter distance between facilities was present. See, e.g., Office Depot, 184 F.3d at 508 (45-75 miles); In re First Security Servs. Corp., 329 NLRB 235, 237, 1999 WL 776225 (1999) (5-28 miles). The decision in this case does not depart firom any prior precedent.
D. Conclusion
Guardian makes a strong argument that a bargaining unit comprising the guards at all three of its branch locations would be more appropriate than separate units. However, the NLRB does not have to choose the most appropriate unit, but simply an appropriate unit, and Guardian has not shown a lack of substantial evidence supporting the determination that single-location bargaining units would be appropriate here or that the determination was otherwise arbitrary, unreasonable, or an abuse of discretion. While we may have serious reservations about the wisdom of the NLRB’s decision, it is not the wisdom of the judgment that is before us here. And while we might conclude that this record contains substantial evidence to support the findings that Guardian urges, our jurisdiction extends only to a determination of whether the record also contains substantial evidence to support the decision of the NLRB. Because it does, we must deny Guardian’s petition for review.
III. Petition for Enforcement
Because the NLRB’s decision that single-location bargaining units are appropri *307 ate is not arbitrary or capricious and is supported by substantial evidence, the elections were valid, and the Union was appointed the exclusive bargaining representative of the employees at the two locations. The NLRB’s decision mandating that Guardian bargain with the Union is therefore fully enforceable. See 29 U.S.C. § 158(a)(5) (prohibiting an employer from refusing to bargain collectively with its employees’ representative); 29 U.S.C. § 158(a)(1) and 29 U.S.C. § 157 (making it an unfair labor practice to interfere with employees’ rights to bargain collectively through their appointed representatives); NLRB v. Forest City Enters., 663 F.2d 34, 35 (6th Cir.1981) (in order to justify a refusal to bargain, the employer must show that the NLRB’s decision was an abuse of discretion).
IV. Conclusion
For the foregoing reasons, we DENY Guardian’s petition for review and GRANT the NLRB’s petition for enforcement.