**ARMCO, INC.** (86–5616/86–5825), **United Steelworkers of America, Local 1865** (86–5707/86–5826), **Petitioners Cross-Respondents,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent Cross-Petitioner.**

Nos. 86–5616, 86–5707, 86–5825 and 86–5826.

United States Court of Appeals, Sixth Circuit.

Argued June 12, 1987.

Decided Nov. 3, 1987.

Rehearings and Rehearings En Banc Denied Feb. 4, 1988.

Jerome Powell (argued), William H. Willcox, Reed, Smith, Shaw, McClay, Washington, D.C., Christopher Killion, Robert A. Dimling, Frost and Jacobs, Cincinnati, Ohio, for Armco, Inc.

Elliott Moore, Deputy Associate General Counsel, N.L.R.B., David Fleischer (argued), Washington, D.C., for N.L.R.B.

John McKendree, McKendree & Toll, Denver, Colo., Helen de Haven, Knoxville, Tenn., for Oil, Chemical and Atomic Workers Intern. Union.

Lafe C. Chapin, Ray L. Hampton, II, Barrett, Chafin, Lowry and Hampton, Huntington, W.Va., for amicus curiae O.C.A.W., Local 3–523.

Elliott Bredhoff, Bredhoff and Kaiser, Jeremiah A. Collins (argued), Cynthia L. Estlund, Washington, D.C., for United Steelworkers of America, AFL–CIO, and its Local 1865.

Before MERRITT and MARTIN, Circuit Judges, and BROWN, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

Armco, Inc., and the United Steelworkers of America seek review of an order of the National Labor Relations Board finding them guilty of an overly-aggressive orga-

nizational effort in violation of the National Labor Relations Act.

This case arises from Armco's acquisition of an Allied Chemical coke plant in Ashland, Kentucky on December 31, 1981. Armco owned and operated a steel production plant only a few miles from the coke plant, and it paid $100 million to Allied with the idea of obtaining a constant and high-quality supply of coke for its Ashland blast furnaces.

The controversy arose from Armco's unilateral decision to accrete the coke plant workers to the Steelworkers' bargaining unit at the steel plant, and from its failure to recognize or bargain with the Oil, Chemical and Atomic Workers (OCAW) which had always represented the workers at the coke plant. This decision resulted in a meeting at which the coke workers were required to sign Steelworkers' dues check-off cards if they wished to work for Armco. The National Labor Relations Board found that the coke workers represented a separate and appropriate bargaining unit and that Armco's actions constituted unfair labor practices in violation of sections 8(a)(1), (2), (3), and (5), and 8(d) of the National Labor Relations Act, 29 U.S.C.A. §§ 158(a)(1), (2), (3), and (5), and § 158(d). The Board also found that, by its actions, the Steelworkers had violated sections 8(b)(1)(A) and (b)(2) of the Act, 29 U.S.C. §§ 158(b)(1)(A) and (b)(2). This decision appears at 279 N.L.R.B. 143 (May 30, 1986), and it affirms the lengthy rulings of the administrative law judge.

For the reasons that follow, we affirm, and we order that the decision of the Board be enforced.

## I. FACTS

For approximately 35 years, Allied Chemical Corporation was engaged in the production of coke and its byproducts at the Ashland plant. Since 1952, that plant's employees were represented by the OCAW International Union, its Local 3–523, and OCAW's predecessor. The most recent collective bargaining agreement between Allied and OCAW was effective from August 5, 1979 through May 14, 1982. During 1981, the coke plant produced 500 tons per day, nearly all of which was sold to Armco. But, because the plant's production capacity was 2800 tons per day, nearly two-thirds of the employees had been laid off.

The employees of Armco's Ashland Works had been represented by the Steelworkers since 1942, and their most recent contract was effective from March 1, 1983 through July 31, 1986. During 1981, Armco needed about 2800 tons of coke per day to operate its Ashland Works. The coke Armco did not buy from Allied was purchased on the open market.

In 1979, Allied decided to withdraw from the coke-producing business, and it began selling its facilities. In 1981, Armco began looking toward the purchase of the Ashland coke plant. Armco apparently considered a number of alternative methods of operating the plant, and it decided that the most efficient way would be to integrate the facility into its Ashland Works. There were two other alternatives: operating it as a self-standing unit, which Armco alleges would have caused redundancy in maintenance personnel and would have continued the need to stockpile coke as a hedge against production interruptions; and purchasing assets only, allowing the company to hire new labor. The latter option was apparently rejected as incompatible with the strong union ethic predominant in Ashland. In addition, it would have been a great burden for Armco to train all new personnel.

In November 1981, Allied and Armco signed a letter of intent concerning the purchase. On November 25, two Allied representatives informed OCAW President Robert Goss of the purchase plan, telling him that Armco would not recognize the OCAW contract. Armco's Corporate Director, James Wallace, informed the Steelworkers District Director Edgar Ball that Armco wished to bring the coke plant workers in under the Steelworkers contract and that the company would not recognize the OCAW. On November 30, Ball called Goss and related this development. Goss responded that, if satisfactory arrangements could be made with respect to job

security, seniority, and pensions, the OCAW would consider releasing the employees.

Numerous conversations between the various parties ensued. The Steelworkers union was concerned that the OCAW might file raiding charges with the AFL–CIO. The OCAW's International Representative, Kenneth McKeand, said he intended to do everything in his power to keep the coke workers OCAW. It soon became clear, however, that the OCAW had little leverage against Armco. An Allied representative stated that, if Armco did not buy the plant, it would be shut down. Thus, despite an overwhelming vote among the coke workers to maintain their OCAW status and avoid accretion into the Steelworkers, the OCAW had no viable alternative because Armco was represented as "the only show in town."

A memorandum of understanding was signed between the Steelworkers and Armco on December 15, 1981, detailing the arrangements governing the purchase of the plant and the hiring of the coke workers. As a result, Armco offered to hire all of the Allied employees, recalling laid-off workers as production increased, with no probationary period required. The Allied workers, though, would all be given a new seniority date of December 31, 1981, and they all would be required to sign Steelworkers dues checkoff and authorization cards as a condition of employment. Although both Goss and McKeand initially objected to this requirement, they eventually told the coke workers to sign the cards rather than risk losing their jobs. At no time, however, did OCAW unconditionally release the employees to the Steelworkers, and at no time did the workers vote to be represented by the Steelworkers.

The sale was final on December 31, 1981, and, as of January 2, 1982, Armco began applying the terms of its bargaining agreement with the Steelworkers to the coke plant employees. Armco had purchased all of Allied's equipment, material, and supplies, and it operated the plant with the same machinery, equipment, and production methods previously used by Allied.

What then followed were disagreements and struggles within the OCAW itself, apparently caused by dissatisfaction of the Local members. In March 1982, the officers of the Local OCAW sent a letter to the Steelworkers denying that the coke plant was an accretion to the existing Armco unit, and the letter stated that the OCAW had never been notified of negotiations between Armco and the Steelworkers involving the coke plant employees. These negotiations involved the coke workers' terms and conditions of employment and resulted in lost pensions, wages, seniority, vacations, and benefits. The Steelworkers did not respond to the letter.

In his letter of March 18, OCAW President Goss announced a meeting to be held March 28 to determine the position of the members on the issue of whether the OCAW should assert bargaining rights. The letter stated that the OCAW had not previously asserted those rights because its primary concern had been to ensure job opportunities and recall rights. Approximately 300 members attended the meeting, and they voted unanimously to assert the OCAW's bargaining rights at the coke plant.

On April 5, a committee of Local OCAW members sent Armco a letter demanding that it negotiate with the OCAW. The union denied that the coke plant was properly accreted to Armco's Steelworkers bargaining unit, and it asserted that Armco's interest in dealing with a single union was outweighed by the rights of the employees to choose their own bargaining representative. Armco responded by letter on April 12. The company refused to bargain with the OCAW committee on the ground that the coke workers were part of the Steelworkers bargaining unit.

Also on April 5, OCAW President Goss reported to the Local members that he was placing the Local union under the administratorship of an International representative. This change displeased Local members; through attorney Richard Bank, they filed an unfair labor practice charge against the OCAW International. The OCAW International then filed suit in fed-

eral court to enjoin the Local committee members from attempting to bargain on behalf of the OCAW. The district judge held a hearing on April 14 at which the various factions of the OCAW reached an agreement. The OCAW International agreed to file an unfair labor practice charge against Armco, and it agreed to attempt to regain bargaining rights. Bank agreed to withdraw the charges brought against the International. The court then entered an order denying the injunction against the Local, but the order did establish a limited administratorship for the purpose of holding an election of officers.

On April 15, the OCAW filed a charge against Armco, and the union made its first formal, authorized demand for recognition as the bargaining representative of the coke workers. The charge against the Steelworkers, which was consolidated with the charge against Armco, was filed by attorney Bank on June 14, 1982.

## II. PROCEEDINGS BELOW

The administrative law judge upheld the OCAW's complaint against both the Steelworkers and Armco. He ordered that Armco cease granting recognition to the Steelworkers as the bargaining representative of the coke plant employees, cease giving effect to the collective-bargaining agreement between Armco and the Steelworkers for the coke workers, and cease giving effect to any dues checkoff authorizations in favor of the Steelworkers. He also ordered that Armco and the Steelworkers jointly and severally reimburse the coke workers for dues unlawfully withheld since January 1, 1982, with interest. The administrative law judge then recommended that Armco reinstate the terms and conditions of employment for the coke workers that were in effect prior to Armco's unilateral changes. He also recommended that Armco reimburse the employees for any monetary loss suffered as a result. He specifically stated that Armco could not withdraw any benefits which had inured to the coke workers. He then ordered that Armco must bargain upon request with the OCAW

as the exclusive representative of the workers in a bargaining unit defined as:

> All production and maintenance, all accounting clerical, office traffic clerical and stores clerical, plant chemist, research technicians, employees of the company at its Ashland, Kentucky [coke] plant, but excluding assistant plant controller, all employee relations department, plant buyer, storekeeper, draftsmen, and technicians of the plant engineering office, professional employees, guards and all supervisors as defined in the Labor–Management Relations Act, 1947.

As for the Steelworkers, the administrative law judge ordered that it cease giving effect to its collective bargaining agreement on behalf of the coke workers, cease accepting or deducting dues from the coke plant employees, and cease restraining or coercing the coke plant employees in the exercise of their rights guaranteed under Section 7 of the Act. He also held the Steelworkers liable for the reimbursement of the coke plant employees, with interest, for any dues deducted since January 1, 1982.

The recommendation and the remedial order were adopted by the National Labor Relations Board. (One of the three members of the panel dissented in part.)

## III.

Both the Steelworkers and Armco argue on appeal that the Board abused its discretion in finding that the coke workers constituted a separate and appropriate bargaining unit and that, therefore, neither party violated the Act by its actions. The Steelworkers union also contends that the charge filed against it was untimely because it was filed beyond the six-month limitations period of section 10(b), 29 U.S.C. § 160(b). As mentioned above, we find that the OCAW's action was timely filed, and we hold that the Board did not abuse its discretion in finding the coke plant employees were a separate and appropriate unit.

## A. *The Statute of Limitations*

■ The Steelworkers union attempts to rely on *United States Postal Service Marina Mail Processing Center*, 271 N.L.R.B. 397 (1984), to show that the OCAW had unequivocal notice of Armco's decision to recognize the Steelworkers as the coke workers' representative earlier than December 15, 1981, the date of the memorandum of understanding. We are not persuaded. While we agree with the Board's statement in that case, that the 10(b) period begins to run at the time an employee receives unequivocal notice of an adverse employment action rather than the time that action becomes effective, 271 N.L.R.B. at 400, we find that such an interpretation does not serve to bar the OCAW's action against the Steelworkers in this case.

Here, the Steelworkers union contends that the statutory period began to run on December 5, 1981, when Armco's manager informed OCAW representatives that Armco would treat the coke workers as an accretion to the Steelworkers unit and recognize the Steelworkers as their bargaining representative. As the Board points out in its brief, there is no evidence that the Steelworkers' representatives present at the December 5 meeting assented to Armco's plan. At a meeting a few days earlier, the Steelworkers had expressed concern over being charged with violating the no-raiding provisions of the AFL–CIO constitution. The OCAW may reasonably have assumed that the Steelworkers would honor these provisions. Thus, though the announcement at this meeting certainly provided the OCAW with notice of Armco's intent, we cannot construe it to have constituted unequivocal notice of what the Steelworkers planned to do. We find that such unequivocal notice only occurred on December 15, 1981, when the Steelworkers signed the memorandum of understanding with Armco. Thus, the June 14, 1982 charge against the Steelworkers was filed within the six-month time period of section 10(b).

## B. *Accretion versus a separate and appropriate unit.*

■ Both the Steelworkers and Armco contend that the Board improperly determined that the coke plant employees constituted a separate and appropriate bargaining unit and that, therefore, the employees were properly represented by the Steelworkers. We disagree, and we hold that the Board's designation of the coke plant workers as an appropriate unit was correct.

■ To determine whether two groups of employees should be included in the same bargaining unit, the Board applies a "community of interests" test: the two groups must share a "community of interests sufficient to justify their mutual inclusion in a single bargaining unit." *Pacific Southwest Airlines v. NLRB*, 587 F.2d 1032, 1038 (9th Cir.1978). This test consists of several factors: (1) similarity in skills, interests, duties, and working conditions; (2) functional integration of the plant, including interchange and contact among the employees; (3) the employer's organizational and supervisory structure; (4) the bargaining history; and, (5) the extent of union organization among the employees. *NLRB v. American Seaway Foods*, 702 F.2d 630, 633 (6th Cir.1983). "Employee desires," an additional factor frequently included in other circuits, is not a relevant factor in this circuit. *NLRB v. Pinkerton's, Inc.*, 428 F.2d 479, 484 (6th Cir.1970).

Because of its wide experience, the Board should be given some deference in its selection of an appropriate bargaining unit through the application of the "community of interests" test. *South Prairie Construction Co. v. Local 627, Operating Engineers*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976). The Board's ultimate determination as to the appropriate unit must be upheld unless it is arbitrary, unreasonable, or an abuse of discretion. *NLRB v. American Seaway Foods, Inc.*, 702 F.2d at 632. But we review the Board's factual conclusions regarding the individual factors with less deference. The National Labor Relations Act provides the standard of review of such factual determinations: 'The findings of the Board with respect to questions of fact if supported by substantial evidence on the record as a

whole shall be conclusive." 29 U.S.C. § 160(a).

We believe the Board's finding that the coke workers constituted a separate, appropriate bargaining unit was not arbitrary, not unreasonable, and not an abuse of its discretion. Further, we believe that the Board's intermediate, factual conclusions, which form the basis for its ultimate determination, are supported by substantial evidence.

The administrative law judge's conclusion that the two employee groups had dissimilar skills, duties, and working conditions is clearly supported by substantial evidence. All parties have acknowledged that the coke workers possess different skills, and that they work in a more hazardous environment than most steelworkers. Moreover, though the coke workers are not necessarily more skilled or better trained, their training is significantly different. This discrepancy surely was one of the reasons Armco chose to hire the Allied employees rather than an entirely new work force. In addition, the carcinogenic conditions existing in the coke plant are a constant hazard to the coke workers, and, therefore, constitute a legitimate ground for separate bargaining.

Armco argues that the second factor, functional integration, was wrongly decided by the administrative law judge to militate against a finding of accretion. Armco emphasizes the continuous nature of the process for coke plant to finished product. We are not persuaded.

Formerly, the coke workers unit was an independent, separate plant with a long bargaining history and a long union relationship. This fact alone suggests the appropriateness of a separate bargaining unit. *Bay Medical Center, Inc. v. NLRB,* 588 F.2d 1174, 1177 (6th Cir.1978) ("Courts have long recognized that the Board may take bargaining history into account when determining whether a proposed bargaining unit is appropriate."). No machinery has been transferred between the plants, and the coke plant continues to maintain its own telephone exchange, credit union, and time clock. Moreover, the coke workers continue to perform the same work, by the same methods, and using the same machinery as before Armco's purchase. Most employees also have the same supervisors. The only real change has been an increase in production, a change which does not alter the nature of the employing industry.

In addition, the lack of employee interchange between plants militates against a finding of functional integration. *NLRB v. American Seaway Foods, Inc.,* 702 F.2d at 635. Out of a workforce of 2700 steelworkers, only 24 maintenance employees have any contact with the coke workers. Such a small, one-way exchange fails to undermine the appropriateness of the coke plant as a separate bargaining unit. *See Victoria Station, Inc. v. NLRB,* 586 F.2d 672, 675 (9th Cir.1978). Furthermore, the hazardous conditions in the coke plant substantially decrease the possibility that steel plant employees would seek to transfer to coke plant jobs.

This fundamental problem, a lack of employee interchange, is exacerbated by the fact that all of the coke workers have a seniority date of December 31, 1981. In relation to the majority of the steelworkers, the coke workers have no seniority. Therefore, it is unlikely that any of the coke workers will be able to transfer in the near future. Thus, Armco's claim that it has done the coke workers a great favor by giving them the possibility of transferring to a more desirable division is not borne out in reality.

The company also argues that the administrative law judge incorrectly assessed the two union's bargaining histories. Although both the steel and coke industries have a history of independent union organization, Armco emphasizes that, in the steel industry, there are no steel plants in which the coke plant workers are represented by a separate union.

This argument is unavailing. Armco has failed to cite any case in which a previously-independent coke plant has been acquired and the employees accreted to a pre-existing steelworkers bargaining unit. Furthermore, the case upon which it primarily relied, *Granite City Steel Co.,* 137

N.L.R.B. 209 (1962), can be readily distinguished. First, *Granite City* involved only 16 original powerhouse employees in contrast to the 400 employees in this case. Second, the wind and steam produced by the powerhouse workers are not commodities, like coke, which can be purchased in the open market. Moreover, these elements, which are used to operate blast furnaces, are arguably more integral to the steelmaking process. Finally, the powerhouse employees in *Granite City* had previously belonged to a bargaining unit which represented all of the powerhouse employees of the Union Electric Company; they had no history as a separate bargaining unit. These factors made a single bargaining unit appropriate in *Granite City*. Here, however, including the coke workers and the steelworkers in the same bargaining unit would compromise the coke workers' section 7 rights "to self organization ... [and] to bargain collectively through representatives of their own choosing...." 29 U.S.C. § 157.

Admittedly, the third factor, the employer's organizational structure, may militate in favor of accretion. We concede that Armco exhibited centralized hiring procedures, and it demonstrated that wages, hours, and terms of employment were generally uniform.

But such proof does not undermine the reasonableness of the Board's determinations. As of the date of the hearing, no new employees had been hired. More importantly, the uniformity in wages, hours, and terms of employment is the result of the disputed conduct: the application of the Steelworkers' contract to the coke plant employees.

In sum, we hold that the Board's finding that the coke workers constituted a separate and appropriate bargaining unit was not arbitrary, not unreasonable, and not an abuse of its discretion. Furthermore, we hold that the factual conclusions which formed the basis of this determination are supported by substantial evidence. Therefore, by treating the employees at the coke plant as an accretion to the steel plant unit, Armco and the Steelworkers violated the Act.

C. *Requiring employees to execute Steelworkers dues checkoff and authorization cards as a condition of employment.*

█ It is well settled that the dues checkoff provisions are intended to be an area of voluntary choice for the employee. *NLRB v. Atlanta Printing Specialties,* 523 F.2d 783, 787 (5th Cir.1975). Threats by either a union or an employer that employees will be discharged for failure to sign checkoff authorization cards violates the Act. *Metal Workers' Alliance, Inc.,* 172 N.L.R.B. 815, 817 (1968). Thus, as long as the Board's factual finding that Armco and the Steelworkers compelled the coke plant employees to sign the cards as a condition of employment is supported by substantial evidence on the record as a whole, we must affirm the Board's conclusion of violation. 29 U.S.C. § 160(a).

█ The evidence demonstrates that the Board's finding is supported by the record as a whole and is entitled to affirmance. Three former Allied employees testified on the record that, during a January 1982 orientation session, they were told that they had to sign checkoff and authorization cards if they wanted to work at Armco. A fourth coke plant employee, recalled from layoff in March 1982, testified that a similar statement was made in an orientation session following his recall. He specifically testified that he signed the checkoff authorization only because he believed he had to do so to get a job. Armco manager J. Edward Maddox admitted that he had taken the position that coke plant employees had to sign the card to work for Armco. The administrative law judge expressly discredited Armco supervisor Herb Salyer's testimony that he had not made statements which employees specifically remembered him making.

We believe that this testimony constitutes substantial evidence to support the Board's finding that Armco and the Steelworkers compelled the employees to sign the union's dues checkoff and authorization

cards as a condition of employment. Thus, we affirm the Board's finding that Armco violated sections 8(a)(1), (2) and (3) of the Act and that the Steelworkers violated sections 8(b)(2) and (b)(1)(A).

### D. Armco's failure to recognize the OCAW

As we have already stated, we believe the Board correctly concluded that Armco was a successor employer and that the coke plant remained an appropriate unit even after the Armco purchase. Under these circumstances, we have no difficulty in finding that Armco violated sections 8(a)(5) and (1) of the Act by failing to recognize and bargain with the OCAW as the representative of the coke workers before making unilateral changes in their working conditions.

The facts fail to support Armco's contention that the OCAW waived its bargaining rights. In any case, such a waiver of a statutory right must be in "clear and unmistakable language." *Timken Roller Bearing Co. v. NLRB*, 325 F.2d 746, 751 (6th Cir.1963). An unambiguous waiver was not evident in this case.

Therefore, as was the case in *NLRB v. Burns Security Services*, 406 U.S. 272, 279–80, 92 S.Ct. 1571, 1577–78, 32 L.Ed.2d 61 (1972), the bargaining unit remained unchanged, and Armco was not entitled to upset the union majority by recognizing another union.

We believe there was substantial evidence to support the Board's conclusion that Armco violated sections 8(a)(5) and (1).

### IV. CONCLUSION

In essence, Armco and the Steelworkers have asked for leniency based on the current adverse economic climate of the steel industry. Their plea also emphasizes the charitable nature of Armco's act of buying a suffering plant and hiring its entire workforce. We have no doubt that Armco stepped in at a crucial moment in the lives of the coke workers and Allied, and we sympathize with the plight of those in the steel industry. We also recognize that the relatively small size of the coke workers bargaining unit creates a possibility of unfair leverage. None of these factors, however, justifies the flagrant refusal of Armco and the Steelworkers to recognize and bargain collectively with the OCAW.

It has come to our attention that the remedy ordered against Armco may be too harsh, for it would require the company to pay wages perhaps as much as three dollars per hour more than the coke workers have been receiving since the time of the plant's purchase. In *Kallmann v. NLRB*, 640 F.2d 1094 (9th Cir.1981), the court set aside part of a similar remedial order and remanded the matter to the Board. The court there found that "[t]he function of the remedy ... is to restore the situation, as nearly as possible, to that which would have occurred but for the violation." *Id.* at 1103, *citing Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941). In *Kallman*, the facts indicated that the employer would not have agreed to union demands to pay the higher rate.

We believe that the same may be true in this case. Thus, we hold that the employer is responsible for the pay difference for the time which would have been required for bargaining. We will remand this matter to the National Labor Relations Board, however, for the factual determination required to decide the extent of backpay. As the court did in *Kallman*, we will leave it to the Board's discretion whether the resolution of these issues should be left to bargaining between the parties.

Therefore, with the exception of the backpay award, we affirm the findings of the National Labor Relations Board, and we grant enforcement of its order.