**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0583n.06
Filed: August 16, 2006

Case Nos. 05-1517; 05-1649

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD, | ) | |
| | ) | |
| Petitioner/Cross-Respondent, | ) | |
| | ) | PETITIONS FOR REVIEW |
| INTERNATIONAL UNION, SECURITY, | ) | FROM THE NATIONAL |
| POLICE AND FIRE PROFESSIONALS OF | ) | LABOR RELATIONS BOARD |
| AMERICA, | ) | |
| | ) | |
| Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GUARDIAN ARMORED ASSETS, LLC, | ) | |
| INC.; GUARDIAN ARMORED SECURITY, | ) | |
| | ) | |
| Respondents/Cross-Petitioners. | ) | |
| | ) | |

---

**BEFORE: BATCHELDER and GRIFFIN, Circuit Judges; ZATKOFF\*, District Judge.**

**ALICE M. BATCHELDER, Circuit Judge.** Guardian Armored Assets, LLC, and

Guardian Armored Security, operating as Guardian Security Services ("Guardian"), petition for

review of a decision of the National Labor Relations Board ("NLRB" or "Board"), holding that

Guardian had violated §§ 8(a)(1) and 8(a)(5) (29 U.S.C. §§ 158(a)(1) & (5)) of the National Labor

Relations Act ("the Act") by refusing to bargain with Intervenor International Union, Security,

Police and Fire Professionals of America ("the Union"). *See* 29 U.S.C. § 160(f). The Board's

---

\*The Honorable Lawrence P. Zatkoff, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

decision followed the decision of the director of the Region 7 office of the NLRB ("the regional office") certifying the Union as the exclusive bargaining representative of certain employees of two of Guardian's three Michigan facilities. The NLRB petitions for enforcement of its order requiring Guardian to cease and desist from refusing to bargain with the Union and from interfering with employees in the exercise of their rights, and that Guardian post a remedial notice. *See* 29 U.S.C. § 160(e). Because we find that the NLRB did not abuse its discretion and the underlying decision of the regional office was supported by substantial evidence, we will grant the NLRB's petition for enforcement and deny Guardian's petition for review.

## I. Factual Background

### A. Guardian Corporate Structure and Activities

Guardian provides a wide range of security services to its clients, including alarms, security guards, medical monitoring, and armored car transportation of valuables. It employs approximately 1700 people and has its corporate offices in Southfield, Michigan. The case involves the Guardian armored car division, which employs approximately 370 people, including about 50 managers and other non-guard personnel. Non-supervisory guard personnel include 10 types of guards, specialists, vault associates, security officers, dispatchers, and tellers.

The business of the armored car division is conducted out of three branch offices; the Highland Park office, which has approximately 250 employees; and the Mt. Morris and Comstock Park offices, which have approximately 60 employees each. The three branch offices are strategically located to serve Guardian's customers in Michigan and northwest Ohio, though none of them has a geographically defined territory. Highland Park and Mount Morris are approximately 75 miles apart; Highland Park and Comstock Park are approximately 190 miles apart; and Comstock

Park and Mt. Morris are approximately 100 miles apart. Guardian determines which branch to work from in providing service to a customer based on that customer's needs and security considerations.

Jeffrey Prough ("Prough"), the President of Guardian Security Services, and Jeff Kipp ("Kipp"), the Vice President, oversee all of Guardian's operations – including the labor relations policies – of all divisions, including the armored car division. Both officers are in regular contact with all divisions and branches. Hugh Adams ("Adams") is the general manager of Guardian's armored car division, and has an office at each branch location. He rotates around to the branches and oversees employee scheduling, customer accounts, and weekly management training meetings. The branches are controlled by the same human resources and business departments as the company at large, and the centralized functions include purchasing; billing; promulgation of employment policies, handbooks, and the like; payroll; hiring, firing, layoffs, transfers, and promotions; and orientation training.

At the Highland Park branch, Guardian's general manager is in charge of the armored car division as well as other divisions housed in the same facility, and an assistant branch manager and a customer service manager are in charge of most of the armored car division's day-to-day operations. Two assistant branch managers oversee daily operations at the Mt. Morris facility, and a branch manager oversees daily operations at Comstock Park. The managers in charge of the three facilities communicate with each other regularly on the phone.

Each day there is a shuttle run among Highland Park and the other two branches in which one armored car picks up and delivers currency and paperwork; generally the same employees work this route every day. Additional runs between facilities are less frequent. Employees transfer among branches on occasion to cover a particular facility's operations when it is temporarily short-handed,

although Guardian does not keep track of how often this occurs or how many employees are involved when it does occur. Guardian presented testimony that there had been a few instances of temporary transfers in the two years preceding this case, one of which involved 6 or 7 guards over the course of three days, and that there have been roughly 11 permanent transfers among the three facilities over that same two-year period. Adams decides which employees will be going to the other branches when temporary transfers are needed, although the transfers are usually on a voluntary basis.

## B. Representation Proceedings

Prior to 2004, none of the three branches had any history of collective bargaining. On March 12, 2004, the Union submitted a request to the regional office that a single bargaining unit be recognized covering 180 employees, to include all of Guardian's "full time and/or regular part time security officers and drivers performing guard duties" at all three branch locations. The regional office directed that a hearing be held on the petition, but the Union withdrew the petition shortly before the appointed hearing date. The Union then filed a second request, proposing a single bargaining unit consisting of full-time and part-time employees performing guard duties at the Mt. Morris and Highland Park facilities, and stating that the number of employees involved would be 200.

The regional office conducted a hearing on the second request. At that hearing, the Union again changed its position and asked that the Highland Park and Mount Morris facilities each be a separate bargaining unit and that each have its separate election. Guardian opposed the certification of one bargaining unit for each branch on the grounds that Guardian's business operations at all three Michigan branches are fully integrated, branches have no autonomy from one another or from

4

the company at large, and employees assigned to each branch regularly coordinate, interchange, and interact with employees from the other branches. It therefore contended the appropriate bargaining unit would be a single unit consisting of all full-time and part-time guards at all three of its facilities.

The director of the regional office granted the Union's request and ordered separate elections at the Highland Park and Mt. Morris facilities, finding that the separate bargaining units requested by the Union are appropriate for collective bargaining purposes within the meaning of § 9(b) of the Act (29 U.S.C. § 159(b)). The director acknowledged the evidence in the record showing that Guardian has centralized control over personnel decisions and some centralized control over daily operations; the employees at all locations have the same skills; and all employees are paid at the same rate. The director nonetheless noted that a single-facility bargaining unit is "presumptively appropriate" unless other considerations show that the units have been effectively merged or have otherwise lost their separate identities.

The director based his decision that separate units are appropriate on findings that the branches retain some autonomy over day-to-day operations, there is minimal interchange and interaction between employees at the various branches, and the geographical distance between the facilities is substantial. Especially significant to the director was the fact that the degree of employee interchange among the Guardian branches is much less frequent than that found in *In re Purolator Courier Corp.*, 265 NLRB 659 (1982), and *In re Dayton Transport*, 270 NLRB 1114 (1984), two previous decisions in which the NLRB found that the presumption of a single-location unit had been rebutted because of the high degree of interrelatedness.

Finally, the director concluded that vault leaders and dispatchers would be included within the collective-bargaining unit, and allowed the lone assistant supervisor to vote in the election under challenge. Mechanics were excluded from the bargaining unit.

Guardian filed a request for review with the NLRB, which was denied by two members of a three-member panel. The two elections were held on June 10, 2004, and the Union was certified as the exclusive bargaining representative of each unit. The Union requested that Guardian begin bargaining, but Guardian refused to recognize the Union as the employees' bargaining agent on the grounds that the determination that there be two units was legally improper.

The Union filed an unfair labor practices charge with the NLRB, alleging violations of §§ 8(a)(1) and (5) of the Act (29 U.S.C. § 158(a)(1) & (5)). Based on the charge and a subsequent investigation, the general counsel of the regional office issued a complaint against Guardian. The regional office filed a motion for summary judgment, and the NLRB issued a show cause order, to which Guardian responded. The NLRB granted summary judgment to the regional office, finding that Guardian's refusal to bargain with the Union violated §§ 8(a)(1) and (5) of the Act. It rested its decision on reasoning contained in the determination by the regional office that two bargaining units were appropriate, and noted that Guardian had not presented any newly discovered evidence or alleged any special circumstances to justify its refusal to bargain. Guardian now petitions for review of this decision, and the NLRB seeks to enforce its order.

## II. Petition for Review

### A. Standard of Review

The Supreme Court has held that the NLRB's determination that a particular collective bargaining unit is appropriate "lies largely within the discretion of the Board," and that an exercise

of the NLRB's discretion "is rarely to be disturbed." *South Prairie Constr. Co. v. Operating Eng'rs, Local 627*, 425 U.S. 800, 805 (1976) (citing 29 U.S.C. § 159(b)). *See also Office Depot, Inc v. NLRB*, 184 F.3d 506, 507-508 (6th Cir. 1999). In accord with this broad grant of discretion, we review the NLRB's decision only to ensure that it is not arbitrary, unreasonable, or an abuse of discretion. *Armco, Inc. v. NLRB*, 832 F.2d 357, 362 (6th Cir. 1987); *NLRB v. Child World, Inc.*, 817 F.2d 1251, 1253 (6th Cir. 1987). *See also NLRB v. American Seaway Foods, Inc.*, 702 F.2d 630, 632 (6th Cir. 1983) (stating that the scope of review is "exceedingly narrow"). We must accept the NLRB's factual findings unless those findings are not supported by substantial evidence, considering the record as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951); *Dayton Newspapers v. NLRB*, 402 F.3d 651, 659 (6th Cir. 2005) ("Substantial evidence consists of such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (internal quotations and citations omitted); *NLRB v. Spring Arbor Distrib. Co.*, 59 F.3d 600, 604 (6th Cir. 1995) ("[S]ubstantial evidence is more than a mere scintilla of evidence. Therefore, our review must include consideration of any record evidence that runs contrary to the Board's findings.").

## B. "Appropriate" Units Under the Act

Section 9(b) of the Act gives the NLRB the power to determine the scope of the unit appropriate for the purposes of collective bargaining, so as to "assure to employees the fullest freedom in exercising the rights guaranteed by the Act . . . ." 29 U.S.C. § 159(b). The determination of an appropriate bargaining unit depends heavily on the facts of each individual case. *See Bry-Fern Care Center, Inc. v. NLRB*, 21 F.3d 706, 709 (6th Cir. 1994). The NLRB does not have to select the most appropriate unit, but is charged only with selecting *an* appropriate unit for bargaining from a

range of units of appropriate size. *See Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 610 (1991); *Office Depot*, 184 F.3d at 508; *NLRB v. First Union Mgt.*, 777 F.2d 330, 333 (1985).

Generally, the NLRB has broad discretion in determining whether a petitioned-for bargaining unit is appropriate and in ordering representation elections. *See Bry-Fern*, 21 F.3d at 709; *NLRB v. A.J. Tower Co.*, 329 U.S. 324 (1946); *Tony Scott Trucking, Inc., v. NLRB*, 821 F.2d 312 (6th Cir. 1987). We have recognized that the NLRB utilizes a presumption that a single location in a multiple-location business is an appropriate bargaining unit. *See Child World*, 817 F.2d at 1253; *Wyandotte Sav. Bank v. NLRB*, 682 F.2d 119, 120 (6th Cir. 1982). *See also* 29 U.S.C. § 159(b) (a "plant unit" may be appropriate). *But see NLRB v. Catherine McAuley Health Ctr.*, 885 F.2d 341, 347 (6th Cir. 1989) (presumption unwarranted where actual separation of facilities cannot be shown). Therefore, the burden at the agency level is on the employer to overcome this presumption and to show that such a unit is *inappropriate*, not simply that a more appropriate unit exists. *See Dunbar Armored, Inc. v. NLRB*, 186 F.3d 844, 847 (7th Cir. 1999); *In re J & L Plate, Inc.*, 310 NLRB 429, 429 (1993).

An "appropriate" unit is one which furthers the Act's policy of efficient collective bargaining. *See* 29 U.S.C. § 159(b). When making a determination as to whether to approve a bargaining unit, "the extent to which the employees have organized shall not be controlling," 29 U.S.C. § 159(c)(5), so the fact that the employees self-identify in single-location units is not the only factor to be considered. *See Catherine McAuley*, 885 F.2d at 344. Moreover, the agency must explain the basis for its order and give a "clear indication that it has exercised the discretion with which Congress has empowered it." *NLRB v. Metro. Life Ins. Co.*, 380 U.S. 438, 443 (1965).

8

On past occasions, the NLRB has both declined to certify single-branch bargaining units in the armored car business, *see In re American Courier Corp.*, 184 NLRB 602 (1970); *Purolator Courier*, 265 NLRB 659; and approved single-location bargaining units in the armored car business, *see Dunbar Armored*, 186 F.3d at 848; *NLRB v. J.W. Mays, Inc.*, 675 F.2d 442, 443 (2d Cir. 1982); *In re New Britain Transp. Co.*, 330 NLRB 397, 397 (1997); *In re Courier Dispatch Group, Inc.*, 311 NLRB 728, 728 (1993). Finally, it is undisputed that the NLRB is to consider several factors when determining whether the presumption of single-location units has been rebutted: (1) centralized control versus local autonomy over daily operations and labor relations; (2) similarity of skills, functions, and working conditions; (3) degree of employee interchange; (4) geographic proximity of the various branch offices; and (5) bargaining history. *Office Depot*, 184 F.3d at 508.

## C. Analysis

Guardian argues that the NLRB's decision rested completely on the presumption that a single-location unit is appropriate and that the decision was inconsistent with prior precedent, failed to comport with the requirements of the Act, and was not supported by substantial evidence.

### 1. Inconsistency With Prior Precedent

Initially, Guardian argues that the NLRB's decision in this case must be overturned because it failed to explain why it was departing from its own precedent in cases in which it did not permit single-location bargaining units. However, the NLRB is not required to discuss every instance in which it has encountered similar facts and to detail how it distinguishes those cases from the one presently before it, lest it be found to have abused its discretion. Furthermore, as we shall explain, this decision did not depart from prior precedent.

### 2. Failure to Conform to Requirements of the Act

9

Guardian points to the fact that the Union, after filing its initial petition, twice changed its position regarding the appropriate bargaining units. It argues that these changes were made in an effort to obtain NLRB approval of bargaining units in which the Union would have the greatest chance of winning representation elections. The fact that the NLRB upheld the separate bargaining units and separate elections demanded by the Union demonstrates, according to Guardian, that, contrary to § 9(c)(5) of the Act, the NLRB relied exclusively, or at least too heavily, on the extent to which the employees had organized themselves prior to the approval of the petition. *See* 29 U.S.C. § 159(c)(5) ("In determining whether a unit is appropriate for the purposes specified in subsection (b) of this section the extent to which the employees have organized shall not be controlling."). Employee organization is one of the factors that may be taken into account in determining the appropriate bargaining units, although it is not dispositive of the issue. *See id.*; *see also Metro. Life Ins. Co.*, 380 U.S. at 442. But the record contains no evidence that the NLRB actually took employee organization into account here, and the fact that the Union repeatedly changed its position as to the bargaining units it wanted certified does not, without more, demonstrate that the NLRB gave undue weight to that factor.

Guardian argues further that the Board's decision did not comport with the requirement that the decision "effectuate the Act's policy of efficient collective bargaining." *See Catherine McAuley*, 885 F.2d at 344. However, Guardian points to no particulars and provides no explanation to support this claim. This objection is without merit.

### 3. Substantial Evidence

While asserting that "[n]ot even a 'scintilla' of evidence supports the Board's critical findings here," Guardian discusses only the volume of evidence that supports its own contention that

a multiple-location bargaining unit would be appropriate. Guardian sheds little light on the issue before us here: whether the record as a whole lacks substantial evidence supporting the NLRB's position. We agree that Guardian has presented strong evidence to support its position. But even if we – had we been the finders of fact here – might have come to the conclusion Guardian urges, unless Guardian demonstrates a *lack* of evidence supporting the NLRB's position, we cannot overturn the NLRB findings. And we conclude that this record contains substantial evidence supporting the NLRB's decision.

### a. Local Autonomy/Functional Integration

Guardian argues that "all matters that might ultimately become the subject of collective bargaining are determined by Guardian centrally." However, there is evidence on the record that employees report to their respective branch offices every day, get their assignments from that branch, are dispatched from that branch, maintain contact with that branch while on their routes, and return to that branch at the end of the day. There are assistant branch managers that make sure that the employees working from that branch are performing their job duties within company guidelines, ensure that the work is completed, and contribute to the employees' performance evaluations. And though customers are not assigned to any particular facility, the service to a given customer on a given day is dispatched from one of the three branches, not from any central facility.

It is true that, where labor policy is determined centrally, and where local managers do not have the authority to decide collective bargaining matters, the facts weigh against location-specific bargaining units. *See NLRB v. Pinkerton's, Inc.*, 428 F.2d 479, 484 (6th Cir. 1970); *Wayne Oakland Bank v. NLRB*, 462 F.2d 666, 667-68 (6th Cir. 1972). Guardian relies heavily on the fact that here, only the central human resources department performs functions relating to hiring, firing, and

11

transferring employees.  But in *Dunbar Armored*, the Seventh Circuit found sufficient evidence supporting the single-location bargaining units under very similar circumstances.  186 F.3d at 849; *see also Michigan Hosp. Serv. Corp. v. NLRB*, 472 F.2d 293, 294-95 (6th Cir. 1983); *In re Esco Corp.*, 298 NLRB 837, 840 (1990) (centralized operations and labor relations, limited local autonomy, common skills and functions of employees not enough to overcome presumption where lack of employee interchange and geographic separation between branches); *In re AVI Foodsystems*, 328 NLRB 426 (1999); *Armco*, 832 F.2d at 364 (admitting that centralized hiring goes in favor of certifying a multi-location bargaining unit, but finding that other factors overcame this factor and did not necessarily imply that the NLRB's decision was unreasonable).  Guardian does not dispute that a single-location unit could be appropriate where there is "some" local autonomy, and there is enough evidence here to support the director's finding that "some" autonomy exists.

### b.  Employment Policies and Work Conditions

Guardian cites to the undisputed facts that employment policies are formulated centrally; all hiring, firing, transfers, and promotions are done centrally; personnel records are kept in the central office; and all employees, regardless of home office, are subject to the same rules and conditions and are paid on the same scale and given the same benefits and time off.  Again, the same was true in *Dunbar Armored*, where the court nonetheless found substantial evidence to support the NLRB's conclusions.  *See* 186 F.3d at 846, 848.  *See also Armco*, 832 F.2d at 364 (admitting that uniform wages, hours, and terms of employment are facts in favor of certifying a multi-location bargaining unit, but finding that other factors overcame this factor and did not necessarily imply that the NLRB's decision was unreasonable); *American Seaway*, 702 F.2d at 633 (similarity of skills,

12

working conditions, pay and fringe benefits not enough to overcome other factors). Guardian has not provided evidence that the NLRB's findings in this regard were incorrect.

### c. Supervision

The regional director found that local supervisors direct the day-to-day operations at the branches. Guardian contends this finding is unsupported, citing the various centralized features of the business. While the record certainly establishes that there is central management, the record shows that there is also permanent direct management at each of the branch locations, and the direct management implements the centrally formulated policy and ensures that the employees are performing their assigned tasks. *In re Waste Management*, 331 NLRB 309, 311 (2000), is inapposite: in that case, the NLRB did find that there was direct management and that single-location bargaining units were inappropriate, but relied heavily on the finding that the direct management of employees at a branch location was done by a manager at the main office who would drive out to the branch location every day to hand out work assignments. Similarly, in *In re Frito Lay, Inc.*, 202 NLRB 1011, 1012 (1973), the salesmen seeking to unionize worked out of their homes and the only common supervision was a regional sales manager.

Prough testified that the on-site managers do contribute to employee evaluations, though they do not perform all of the functions related to evaluating employee performance. He further testified that the on-site supervisors report directly to Adams and are the primary people responsible for ensuring employee compliance with company policy and that the employees perform their assigned tasks. In short, when Adams and Prough need to find out what is going on at one of the branches when they are not present, they contact the management at that branch, which has direct oversight there. This is enough evidence to support the finding of the presence of local supervision.

13

### d. Interaction and Interchange

In approving the requested single-location units, the regional director also found that the degree of employee interaction and interchange among the branches was minimal. In rebuttal, Guardian cites the two regular routes between each of the branches, occasional instances where an armored car will begin the day at one branch and end up at another, interaction with employees from the other branches at two "consolidation centers" operated by bank customers, and weekly dispatch of personnel from one branch by dispatchers at different branches. The record also contains some evidence of permanent and temporary transfers from one branch to another, and of the company-wide posting of job openings. Guardian claims that the employees from the branches also interact with one another at orientation and at company-wide awards ceremonies and social events.

*Purolator Courier* and *American Courier*, in which the NLRB found that the degree of employee interchange and interaction overcame the presumption of a single-location bargaining unit, are distinguishable. In *Purolator Courier*, the NLRB found that about 50 percent of the workforce interacted on a daily basis with guards from other branches because the deliveries were completed relay-style; 25 percent stayed overnight at another branch location; and 15 percent performed routes only between branch locations. 265 NLRB at 661-62. In *American Courier*, the couriers often met each other at different locations and passed off materials in relay fashion. 184 NLRB at 603. Nothing even remotely approaching these levels is present here.

The NLRB has in the past also refused to find the presumption in favor of single-location bargaining units overcome where the degree of interchange and interaction was greater than it is in this case. *See Dunbar Armored*, 186 F.3d at 849; *Courier Dispatch*, 311 NLRB at 728, 730. And though there is also evidence that 11 employees were permanently voluntarily transferred – out of

roughly 350 guards – during the two years preceding this case, the NLRB has previously found 21 transfers among 172-182 employees over 3-4 years insubstantial. *See J & L Plate*, 310 NLRB at 430. The NLRB's finding that the degree of employee interaction and interchange was "minimal" is supported by the record.

### e. Geography

In arriving at its decision the NLRB noted that the distances between the facilities is significant but not controlling. In previous decisions, the NLRB has refused to approve single-location units where the employer had more facilities over greater distances that are present here, *see American Courier*, 184 NLRB at 603; *Purolator Courier*, 265 NLRB at 661; *Szabo Food Services, Inc. v. NLRB*, 550 F.2d 705, 708 (2d Cir. 1976); *Frito Lay*, 202 NLRB at 1011; *Waste Mgt.*, 331 NLRB at 51, and has approved such units in circumstances where a similar or shorter distance between facilities was present. *See, e.g., Office Depot*, 184 F.3d at 508 (45-75 miles); *In re First Security Servs. Corp.*, 329 NLRB 235, 237 (1999) (5-28 miles). The decision in this case does not depart from any prior precedent.

## D. Conclusion

Guardian makes a strong argument that a bargaining unit comprising the guards at all three of its branch locations would be more appropriate than separate units. However, the NLRB does not have to choose the *most* appropriate unit, but simply *an* appropriate unit, and Guardian has not shown a lack of substantial evidence supporting the determination that single-location bargaining units would be appropriate here or that the determination was otherwise arbitrary, unreasonable, or an abuse of discretion. While we may have serious reservations about the wisdom of the NLRB's decision, it is not the wisdom of the judgment that is before us here. And while we might conclude

15

that this record contains substantial evidence to support the findings that Guardian urges, our jurisdiction extends only to a determination of whether the record also contains substantial evidence to support the decision of the NLRB. Because it does, we must deny Guardian's petition for review.

### III. Petition for Enforcement

Because the NLRB's decision that single-location bargaining units are appropriate is not arbitrary or capricious and is supported by substantial evidence, the elections were valid, and the Union was appointed the exclusive bargaining representative of the employees at the two locations. The NLRB's decision mandating that Guardian bargain with the Union is therefore fully enforceable. *See* 29 U.S.C. § 158(a)(5) (prohibiting an employer from refusing to bargain collectively with its employees' representative); 29 U.S.C. § 158(a)(1) and 29 U.S.C. § 157 (making it an unfair labor practice to interfere with employees' rights to bargain collectively through their appointed representatives); *NLRB v. Forest City Enters.*, 663 F.2d 34, 35 (6th Cir. 1981) (in order to justify a refusal to bargain, the employer must show that the NLRB's decision was an abuse of discretion).

### IV. Conclusion

For the foregoing reasons, we **DENY** Guardian's petition for review and **GRANT** the NLRB's petition for enforcement.

ZATKOFF, J., dissenting.  As noted by the majority, this Court reviews the NLRB's decision to make certain it is not arbitrary, unreasonable, or an abuse of discretion.  *Armco, Inc. v. NLRB*, 832 F.2d 357, 362 (6th Cir. 1987); *NLRB v. Child World, Inc.*, 817 F.2d 1251, 1253 (6th Cir. 1987).  I agree with the law and facts that serve as the basis of the majority opinion and, accordingly, recite them here only as necessary to elucidate my opinion.  Having said that, I believe that the applicable law and the facts of this case demonstrate that the NLRB decision to allow separate elections at the Highland Park and Mt. Morris facilities was unreasonable and an abuse of discretion because its decision was not supported by substantial evidence.  Therefore, for the reasons set forth below, I would grant Guardian's petition for review and deny the NLRB's petition for enforcement.  Accordingly, I respectfully dissent from the majority opinion.

## I.

The burden is on the employer to show that the bargaining unit chosen is inappropriate.  *See Dunbar Armored, Inc. v. NLRB*, 186 F.3d 844, 847 (7th Cir. 1999); *In re J & L Plate, Inc.,* 310 NLRB 429 (1993).  A bargaining unit can be in the form of a union representing the employees at multiple facilities of the employer (hereinafter, a "central unit" or "central bargaining unit") or a union representing employees at one of multiple locations of an employer (such as Guardian's Highland Park facility) (hereinafter, a "single-location unit" or "single-location bargaining unit").  I believe Guardian met its burden of demonstrating that the single-location units designated by the NLRB were inappropriate.

Although the Supreme Court has held that the NLRB's determination that a particular collective bargaining unit is appropriate "lies largely within the discretion of the Board," and that an exercise of the NLRB's discretion "is rarely to be disturbed,*" South Prairie Constr. Co. v.*

*Operating Eng'rs, Local 627*, 425 U.S. 800, 805 (1976) (citing 29 U.S.C. § 159(b)), such discretion is not unfettered. The NLRB is charged with determining the scope of the unit appropriate for the purposes of collective bargaining, so as to "assure to employees the fullest freedom in exercising the rights guaranteed by the Act . . . ." 29 U.S.C. § 159(b). An "appropriate" unit is one which furthers the National Labor Relations Act's policy of efficient collective bargaining. *See* 29 U.S.C. § 159(b). When making a determination as to whether to approve a bargaining unit as appropriate, however, "the extent to which the employees have organized shall not be controlling." *See* 29 U.S.C. § 159(c)(5); *NLRB v. Catherine McAuley Health Ctr.*, 885 F.2d 341, 344 (6th Cir. 1989). Moreover, the agency must explain the basis for its order and give a "clear indication that it has exercised the discretion with which Congress has empowered it." *NLRB v. Metro. Life Ins. Co.*, 380 U.S. 438, 443 (1965). The agency also must comport with the requirement that the decision "effectuate the [National Labor Relations] Act's policy of efficient collective bargaining." *See Catherine McAuley Health Ctr.*, 885 F.2d at 344. Finally, the NLRB's findings must be "supported by substantial evidence on the record considered as a whole." 29 U.S.C. §160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951). I do not believe the NLRB has fulfilled the foregoing obligations in this case.

## II.

Although there is a presumption that a single-location unit in a multiple facility business is an appropriate bargaining unit, *NLRB v. Child World, Inc.*, 817 F.2d 1251, 1253 (6th Cir. 1987), the NLRB still must consider several factors when determining whether that presumption has been rebutted. Those factors include assessing the: (1) extent of centralized control over daily operations and labor relations, including local autonomy over these things; (2) similarity of skills, functions,

18

and working conditions of employees at the separate facilities; (3) degree of employee interchange; (4) geographic proximity of the various branch offices; and (5) bargaining history (of which there is none in this case). *Office Depot, Inc. v. NLRB*, 184 F.3d 506, 508 (6th Cir. 1999). When the evidence regarding Guardian's business is viewed in an overall context (rather than on an element by element basis as the Director did), I believe the evidence clearly and overwhelmingly demonstrates that the presumption that single-location units are appropriate has been rebutted in this case.

When the Director granted the Union's request that there be two separate elections at the Highland Park and Mt. Morris facilities, the Director noted that a single-location unit is "presumptively appropriate" *unless other considerations show that the units have been effectively merged or otherwise lost their separate identity* (emphasis added). The Director then determined that single-location units at Highland Park and Mt. Morris were appropriate because (i) the branches retained some autonomy over day-to-day operations, (ii) there was minimal interchange and interaction between employees at the various branches, and (iii) there was a significant geographical distance between the facilities. Finally, the Director appeared to give great weight to the fact that the employees desired single-location units.

I do not believe the Director's conclusions are based on substantial evidence which would support allowing elections at both the Highland Park and Mt. Morris facilities.[**] This is especially true where the Director acknowledged that (a) Guardian had centralized control over personnel

---

[**]I would note the Director's findings and the majority opinion appear to take into consideration the functioning and geographic location of the Comstock Park facility. Although the Union initially sought to include the workers at the Comstock Park facility in the statewide election, the ultimate request for elections was limited to workers at the Highland Park and Mt. Morris facilities.

decisions, (b) the employees at all locations had the same skills, and (c) all employees were paid on the same scale. These considerations demonstrate that the Highland Park and Mt. Morris facilities (and their employees) "have been effectively merged or otherwise lost their separate identities." I believe the Director simply ignored these facts once the Director unreasonably concluded that there were some facts that would permit the Union to have the bargaining units it sought.

The NLRB's analysis of the appropriate bargaining unit in this case provides a classic example of why courts should evaluate all of the issues on a case-by-case basis, taking into consideration all of the evidence before the court. Here, the NLRB analyzed each element in a vacuum, without consideration of the other elements. When doing so, the NLRB lost sight of the objective of analyzing the case, *i.e.*, choosing the appropriate unit - the one which furthers the NLRA's policy of efficient collective bargaining. For example, the NLRB focused heavily on the degree of employee interchange between the Guardian branches. The NLRB then compared the employee transfer related facts of this case to the employee transfer related facts of other cases where single-location units were approved and concluded that the employee transfers at Guardian were much lower than those other cases. Such shortsighted analysis ignores the other significant facts of each case that might have been instrumental, or even determinative, when the NLRB or the courts held that single-location units were appropriate.

III.

Upon reviewing the record, I do not believe there is sufficient evidence to support the Board's critical findings here. Rather, the overwhelming evidence demands that the only appropriate bargaining unit (upon a successful election) would be one that encompasses the workers at both the Highland Park facility and the Mt. Morris facility, *i.e.*, a central unit. The law in this

20

Court is clear: where labor policy is determined centrally, and where local managers do not have the authority to decide collective bargaining matters, the facts weigh against location-specific (single-location) bargaining units. *See NLRB v. Pinkerton's, Inc.*, 428 F.2d 479, 484 (6th Cir. 1970); *Wayne Oakland Bank v. NLRB*, 462 F.2d 666, 667-68 (6th Cir. 1972). In this case, only Guardian's central human resources department does anything with regard to hiring, firing, and transferring employees. Moreover, it is undisputed that (1) employment policies are formulated centrally; (2) all hiring, firing, transfers, and promotions are done centrally; (3) personnel records are kept in the central office;[***] and (4) all employees, regardless of home office, are subject to the same rules and conditions, are paid on the same scale and are given the same benefits and time off.

Moreover, even in the Director's decisions which weighed in favor of single-location units, there were significant oversights. First, the Director found that local supervisors direct the day-to-day operations at the branches, but this finding is unsupported. The Director's conclusion that the supervisors permanently present at each site control any day-to-day operations is erroneous because work assignments and routes are generated centrally. Moreover, contrary to the Director's findings, on-site managers do not perform employee evaluations. As Jeffrey Prough, the President of Guardian Security Services, testified, on-site managers *contribute* to employee evaluations, but they do not perform all of the functions related to evaluating employee performance. Similarly, the fact that on-site supervisors are the primary people responsible for ensuring employee compliance with

---

[***]Contrary to the Director's finding that the employees at each branch location maintain their time at that location, the evidence shows that their time is kept in a central computer system. Employee time is only *entered* in branch locations, not kept at them. The Court fails to see how entering time at the facility a Guardian employee works at has any bearing on what the appropriate bargaining unit is. Employees at every company enter their time where they work, no matter where in the company the employee records and control are kept.

21

company policy and that the employees perform their assigned tasks does not reflect local autonomy. Rather, the on-site supervisors simply ensure that the employees in each location are adhering to the central and universal policies of Guardian. They report problems directly to Hugh Adams, the general manager of Guardian's armored car division and the problems are handled centrally.

Next, the Director found that the degree of employee interaction and interchange was minimal. The evidence demonstrates otherwise. There are the two regular routes between each of the branches, instances where an armored car will begin the day at one branch and end up at another, and interaction with employees from the other branches at two "consolidation centers" operated by bank customers. There is also a weekly dispatch of personnel from one branch by dispatchers at different branches. Job openings are posted company-wide, not just at a specific branch. In addition, employees from the branches interact with one another at orientation and at company-wide awards ceremonies and social events.

Clearly, there is less evidence of permanent and temporary transfers at Guardian than in cases such as *American Courier* and *Purolator Courier*, however, this Court has been clear in holding that the degree of employee interaction is not controlling in determining the appropriate unit, particularly where (as here) there is no autonomy with respect to the traditional subjects of collective bargaining. *See Wayne-Oakland Bank, supra*. As such, comparing the employee transfer facts of this case in a vacuum (as the NLRB did) is meaningless and is not determinative of whether a single-location bargaining unit is or is not appropriate. In fact, whether temporary and permanent transfers are used is more a function of need than anything else. As the record in this case evidences, the temporary transfers occurred when one facility was short of employees due to call-ins and there was not frequently a need for such transfers. There is no suggestion that Guardian discouraged

22

transfers or was averse to them. Accordingly, the NLRB's finding that the transfers at Guardian were "minimal" is not significant.

The NLRB also relied on the distance between the facilities in formulating its decision. This issue is likewise meaningless when considering the appropriateness of single-location bargaining units. The NLRB and the courts have exhibited absolutely no uniformity on this issue. In almost any case, the Director can rely on and cite to a prior decision where the geographical facts will be consistent with the bargaining unit determination the Director makes in the case under review. This case is no different.

At Guardian, the facilities and employees at issue were 75 miles apart. As noted by the majority, there have been cases where facilities were located over greater distances than the distance from Highland Park and Mt. Morris, yet they were deemed unfit for single-location units, *see American Courier*, 184 NLRB at 603; *Purolator Courier*, 265 NLRB at 661; *Szabo Food Services, Inc. v. NLRB*, 550 F.2d 705, 708 (2d Cir. 1976); *Frito Lay*, 202 NLRB at 1011; *Waste Mgt. of Washington, Inc.,* 331 NLRB 309 (2000), and instances where a similar or shorter distance was present, but single-location units were approved. *See, e.g., Office Depot*, 184 F.3d at 508; *First Security Servs. Corp.*, 329 NLRB 235, 237 (1999). As such, I do not believe that geographical locale of the Highland Park and Mt. Morris facilities should carry much, if any, weight in evaluating the appropriateness of single-location units in this case.

IV.

Finally, I also believe that the NLRB's decision did not comport with the requirement that its decision "effectuate the Act's policy of efficient collective bargaining." *See Catherine McAuley Health Ctr.*, 885 F.2d at 344. First, it is far more effective to have one bargaining unit to cover the

23

two facilities. Second, there is no evidence that the labor issues and conditions facing the workers in Mt. Morris are any different than the labor issues and conditions facing the workers in Highland Park. Third, and most importantly, it is undisputed that the labor related polices, records and decisions are made and maintained centrally, not in each location. Such uniformity of issues and centrality of operations strongly demonstrates that one central bargaining unit for the Highland Park and Mt. Morris facilities is not only the most appropriate unit in this case, but rather the only appropriate unit.

V.

Accordingly, for the reasons stated above, I would conclude that there is a lack of substantial evidence to support the NLRB's determination that single-location units are appropriate for Guardian's Highland Park and Mt. Morris locations. I would further conclude that the NLRB's determination was unreasonable and an abuse of its discretion. Finally, I would deny the NLRB's petition for enforcement and would grant Guardian's petition for review.